MAXEY *v.* STATE OF INDIANA.

[No. 867S61. Filed February 20, 1969. Rehearing denied May 12, 1969.]

*James E. Sandifer, Compton, Clark & Sandifer,* of Indianapolis, for appellant.

*John J. Dillon,* Attorney General, and *Robert F. Hassett,* Deputy Attorney General, for appellee.

HUNTER, J.—The appellant was charged by indictment with the crime of murder in the first degree. He entered a plea of not guilty, and was tried by a jury. He was found guilty of murder in the second degree and sentenced to the Indiana State Prison for life.

The appellant timely filed an extensive motion for a new trial which was overruled by the trial court. His sole assignment of error to this court is the overruling of that motion. In his brief the appellant urges five objections to the procedure in the trial court as grounds for our reversing his conviction:

1. The trial court erred in overruling defendant's motion to suppress evidence filed prior to trial and in permitting witnesses on behalf of the state to answer questions at the trial pertaining to what they saw, heard and found upon entering defendant's home.

2. It was prejudicial error for the trial court to have overruled appellant's motion to strike the testimony of police officers concerning admissions made by appellant to officers following their custodial interrogation of appellant where there was no showing by the state that appellant voluntarily, knowingly and intelligently waived his right against self-incrimination.

3. It was abuse of the trial court's discretion resulting in prejudicial error for the trial court to have permitted the state at the close of its evidence and after resting

to reopen its case after the trial court had found that defendant's motion for a directed verdict for the reason that the state had failed to prove venue was well taken and that the state in fact had not proved venue.

4. The trial court erred in refusing to give defendant's tendered instruction number 4 concerning the subject of rebutting a presumption of malice from the act of killing by proof that killing resulted from sudden passion, where there was no other instruction given which properly covered the law of such instruction.

5. The verdict of the jury was contrary to law and not sustained by sufficient evidence for the reason that the state failed to prove that the killing was with malice and purpose.

The first two objections require a recital of the evidence relating to the appellant's arrest.

On November 24, 1966, at about 7:29 a.m., Indianapolis police officers Bowman and Phillips received a radio call to proceed to 1812 Koehne "on a disturbance." The officers defined a "disturbance" as a breach of peace in a neighborhood or a house, usually amounting to a family argument or fight. Upon arriving at that address, the officers were met at the door by the appellant's mother. There is a conflict in testimony as to what she told the officers prior to their entering the appellant's house. Both officers testified that the mother seemed excited and said, "Hurry in, my son's just killed his wife." The mother testified that, when the officers arrived, she did not know whether her daughter-in-law was dead or alive, and that she told the officers only that "there's been a fight" and "follow me." The officers then followed the mother into the house without having received the appellant's consent or without having obtained a search or arrest warrant. Officer Bowman testified that at this point he believed that there had been violence in the house and didn't know if anyone was dead yet or not. He further testified that he did not then know and had made no effort to ascertain any knowledge with regard to who owned the house.

The mother led the officers into the kitchen where they first saw the appellant who turned around, thrust out his arms and said, "Take me away. I just killed my wife." The officers asked where the victim was and were told by the appellant, "she's down in the basement, go down and look." Officer Phillips went to the basement and found the deceased about five feet from the stairs, lying on her back with arms extended. At this time, Officer Bowman placed the appellant under arrest and advised him of his constitutional rights. After calling police headquarters to get a deputy coroner and superior officer to the appellant's house, Bowman went to the basement to draw a diagram of the scene. The appellant's stepfather joined Bowman in the basement, identified the victim, and led the police officer to a blood-covered bayonet then located on a washing machine about twenty feet from the body. After having been advised of his constitutional rights by Officer Bowman, and over another officer's admonitions that he was not required to say anything, the appellant several times repeated "I've killed the thing I loved the most."

The appellant, prior to the trial, filed a motion to suppress all the evidence relating to what the police officers had seen, found or heard while in the appellant's house. This motion was overruled by the trial court. At the trial the appellant again moved to suppress the testimony of the police officers who were present at the search of the appellant's home concerning what they had seen, heard or observed during said search. The court also overruled these objections. In his first argument, the appellant contends that this entry into his home constituted an unreasonable search and seizure and that the evidence obtained thereby should have been suppressed by the trial court.

It was the mother and not the appellant who met the police officers at the door and led them into the house. There is authority to the effect that a third party can not waive another person's constitutional immunity against unreasonable search and seizures. C.f., *Dalton* v. *State*

(1952), 230 Ind. 626, 105 N. E. 2d 509. Thus, if the entry or subsequent search of the premises by the police officers was unreasonable, the evidence should have been suppressed.

We believe, however, that the entry by the police officers was lawful and justified by the circumstances. While it is true that, as a general rule, a search warrant or a con-sent is required to allow police officers to enter upon a private dwelling, a well-recognized exception to this general rule is an entry under emergency circumstances. *United States* v. *Jeffers* (1951), 342 U. S. 48. In *Wilson* v. *State* (1966), 247 Ind. 454, 217 N. E. 2d 147, this court held that, where a police officer was informed that a homicide had occurred in a private dwelling, he could lawfully enter without having to obtain a search warrant. There is good reason for such a rule. Where a violent breach of the peace has occurred, the entry by the police can be justified as a means to prevent further injury or to aid those who have been injured.

In the instant case, prior to their entry into appellant's dwelling, the police officers were told that there had been a killing or a fight depending on whose testimony is to be believed. In either event, the police had reasonable cause to believe that an injury had occurred. The officers were led into the house by the appellant's mother, and there is no evidence that any damage resulted to the premises from this entry. We hold that the entry by the police officers into the appellant's home was justified and reasonable under the circumstances.

Furthermore, as soon as a preliminary investigation had revealed the victim's body, the police officers had probable cause to place the appellant under arrest. When they did so, the appellant was immediately advised of his constitutional rights and was advised several times that he did not have to make any statements regarding what had taken place. After arresting the appellant, the officers were entitled to conduct a further search of the premises as said

search was then incident to lawful arrest. It was during this search subsequent to the appellant's arrest that the blood-covered bayonet was discovered. For the foregoing reasons, we hold that the evidence used in the appellant's trial was obtained by a lawful search of the premises, and that the appellant's motions to suppress said evidence were properly overruled by the trial court.

Regarding the appellant's second objection, the only statement made by him prior to his being advised of his constitutional rights which was admitted into evidence was his exclamation on first seeing the police officers. At this point, it could hardly be contended that the officers were conducting custodial interrogation of the appellant or that the appellant's rights against self-incrimination were being violated.

In appellant's third objection, he contends that the trial court committed reversible error in permitting the state to present additional evidence in order to prove venue after it had rested its case and after the appellant had moved the trial court for a directed verdict. The record indicates that the judge had not yet ruled upon appellant's motion for a directed verdict at the time the state was allowed to introduce this additional evidence. It has long been held that the action of a trial court in allowing a party to reopen its case after it has rested is a matter of discretion for the court, and, unless clear abuse is shown, this court will not interfere with such a decision by the trial court. *Roush* v. *Roush* (1900), 154 Ind. 562, 55 N. E. 1017. The appellant has not demonstrated that he was unfairly prejudiced by this procedure, and the only detriment to the defense resulted from a more complete presentation of all the facts relating to the crime with which the appellant was charged. We do not believe that the trial court abused its discretion in admitting the additional evidence after the state had rested its case.

As his fourth objection, appellant contends that the court

erred in refusing to give his tendered instruction number 4, which instruction read as follows:

## "INSTRUCTION NO. 4

1. The Court instructs you that the using of a deadly weapon does not necessarily imply malice.

While the law presumes a sober man to intend what he does, the law does not presume a killing with a premeditated design. This, like every other element of murder in the first degree, is to be inferred by the jury from the facts proved beyond a reasonable doubt.

2. Malice may be proved by direct evidence such as prior threat, assaults, or seeking an opportunity to perpetrate the act. This is called 'express malice.'

Malice may also be implied from the act of killing, if the killing is done purposely and without 'legal excuse or reasonable provocation, or if the act is perpetrated with a deadly weapon so used as likely to produce death; the purpose to kill may be inferred from the act of killing.

On the other hand, if death, though wilfully intended, appears to have been inflicted immediately after some great provocation given by the deceased, which provocation is deemed by the law adequate to excite sudden and angry passions, this fact rebuts the presumption of malice; but the killing is still unlawful, because a man is bound to curb his passions and the offense is manslaughter."

The court, however, did give the jury the following instructions:

## "INSTRUCTION NUMBER 31

A part of the Statute of the State of Indiana, which defines and states the essential elements of the crime of FIRST DEGREE MURDER, with the commission of which this defendant is charged, reads as follows:

'Whoever purposely and with premeditated malice, kills any human being, is guilty of murder in the first degree, and on conviction shall suffer death or be imprisoned in the state prison during life.' "

## "INSTRUCTION NUMBER 32

The Statute of the State of Indiana which defines and states the essential elements of the crime of SECOND DEGREE MURDER, which may be included under the

charge of *FIRST DEGREE MURDER* as shown in the indictment, reads as follows:

'Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of Murder in the Second Degree, and on conviction shall be imprisoned in the State Prison during life.' "

## "INSTRUCTION NUMBER 33

The Statute of the State of Indiana which defines and states the essential elements of the crime of *MANSLAUGHTER* which may be included under the charge of *FIRST DEGREE MURDER* as shown in the indictment, reads as follows:

'Whoever voluntarily kills any human being without malice, expressed or implied, in a sudden heat; or involuntarily, in the commission of some unlawful act, is guilty of Manslaughter and on conviction, shall be imprisoned not less than two (2) nor more than twenty-one (21) years.' "

## "INSTRUCTION NUMBER 35

Malice may be proved by direct evidence such as prior threats, assaults or seeking an opportunity to perpetrate the act. This is called express malice. Malice may also be implied from the act of killing if the killing is done purposely and without legal excuse or sufficient provocation; and if the act is perpetrated with a deadly weapon so used as to likely produce death, the purpose to kill may be inferred from the act of killing."

The appellant's argument is based on the premise that the jury was not instructed that a sufficient provocation would negate any implication of malice and reduce the crime from murder to manslaughter. The only evidence pointed out by the appellant which he contends can serve as a basis for finding sufficient provocation to reduce the killing to manslaughter is found in his own testimony. On direct examination, he stated that during the argument with his wife, she attempted to push him down the basement stairs, that he had grabbed her to break his fall, and that as a result they both fell down the stairs. This is all the appellant could recall as regards how his wife became fatally injured. The appellant did not testify

that this fall provoked him into stabbing his wife, but rather implied that the fall was what had caused her injuries.

"Q. What did you do then?
A. I reached and grabbed her, . . .
Q. And for what reason?
A. . . . in the process — what purpose?
Q. Yes.
A. To prevent me from falling down the stairs, to break my fall, to keep from em, uh, falling straight. This was a break, this was something that to prevent me from falling.
Q. Did you then fall on down the stairs?
A. Yes.
Q. Do you remember a tall cabinet that was located at the foot of the stairs?
A. There, yes, there was one there, yes.
Q. Do you recall if, in falling down the stairs, you struck that cabinet?
A. No.
Q. You did not, or you don't remember?
A. I do not remember.
Q. After you got to the bottom of the stairs, what then happened?
A. This I don't remember.
Q. What do you next remember?
A. I next remember I was back in the back of the room and seeing my wife laying there on the floor.
Q. Now, when you, you were in the back of the basement?
A. Yes.
Q. That would be on what, the east end?
A. Yes, I would, yes.
Q. East end of the basement?
A. Yes.
Q. Now, when you next remembered seeing Mable, where was she lying?
A. The exact location I could, I really don't know, but it was close around the steps."

Inasmuch as the deputy coroner had previously testified that the victim had suffered twelve stab wounds from a sharp-pointed object, it was within the province of the jury to disbelieve that appellant's version of the story. But, even accepting this testimony as true, there is still no evidence to indicate that a single stab to the appellant's wife was provoked by the appellant's fall. Rather, the first act the appellant can remember performing after the alleged fall was going back upstairs to call his mother, and, by this time, the fatal wounds had evidently already been sustained by the victim. We cannot find any evidence to sustain the appellant's contention that the crime was mitigated to manslaughter because the actual attack was motivated by a sufficient provocation. All the other rules of law in the appellant's tendered instruction number four were fully and adequately covered by the final instructions given by the trial court. Thus, we believe that the trial court properly refused to give tendered instruction numbered four (4).

The final objection made by appellant is that there is not sufficient evidence to sustain a finding of malice. Not only the number but the lethal character of the wounds articulates an attack of such intensity that the jury could reasonably infer that malice and purposefulness did exist at the time the wounds were inflicted on the victim.

The deputy coroner testified that there were twelve different wounds to the head and chest of the victim many of which would have to have been caused by a sharp-pointed object and at least some of which could not have occurred by self-infliction or by the victim's having fallen on this object. Two of the lacerations to the head went to the bone, and one to the chest penetrated to a depth of six (6) inches. The appellant admitted that he killed his wife, and, from the nature of her death, it can be inferred that he did so by stabbing her with a bayonet. It is well-established in Indiana that the use of a deadly weapon against an unarmed person in a manner likely to produce death is sufficient evi-

dence from which to conclude that malice existed. *Sparks* v. *State* (1964), 245 Ind. 245, 195 N. E. 2d 469, rehearing granted on other grounds, 245 Ind. 250, 196 N. E. 2d 748; *Warren* v. *State* (1963), 243 Ind. 508, 188 N. E. 2d 108; *Miller* v. *State* (1962), 242 Ind. 678, 181 N. E. 2d 633.

For all the foregoing reasons, the judgment of the trial court should be affirmed.

Judgment affirmed.

DeBruler, C. J., Arterburn and Givan, JJ., concur.

Jackson, J., dissents with opinion.

### DISSENTING OPINION.

JACKSON, J.—I am unable to concur in the majority opinion herein and dissent thereto.

Appellant was charged with the crime of murder in the First Degree by indictment filed in the Marion Criminal Court. Trial was by jury which returned a verdict of guilty of Murder in the Second Degree. Pre-commitment investigation report was filed recommending probation, thereafter the court entered judgment on the verdict of the jury and sentenced appellant "to the Indiana State Prison during life and costs."

The indictment, omitting heading, formal parts and signatures, reads in pertinent part as follows:

"The Grand Jury for the County of Marion in the State of Indiana, upon their oath do present that JAMES MAXEY on or about the 24th day of NOVEMBER, A. D. 1966, at and in the County of Marion and in the State of Indiana, did then and there unlawfully, feloniously, purposely, and with premeditated malice kill and murder one MABEL MAXEY, a human being, by then and there unlawfully, feloniously, purposely and with premeditated malice, cutting and stabbing at and against the body of the said MABEL MAXEY with a certain knife then and there held in the hands of the said JAMES MAXEY and did then and there and thereby inflict mortal wounds in and upon the body of the said MABEL MAXEY, of which mortal wounds the said MABEL MAXEY did then and there and thereby die; and so the GRAND JURORS aforesaid, upon their oaths

aforesaid, do say and charge that the said JAMES MAXEY, in the manner and form and by the means aforesaid unlawfully, feloniously, purposely and with premeditated malice did kill and murder the said MABEL MAXEY, then and there being contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Indiana."

February 15, 1967, appellant was arraigned on the charge embraced in the indictment and entered a plea of not guilty thereto. Thereafter appellant filed a Motion to Suppress Evidence. This motion may be summarized as follows. On November 24, 1966, Indianapolis Police Officers entered and searched appellant's home. The search was by the officers who did not have (1) a warrant for the arrest of appellant, (2) a warrant to search appellant's home. The motion further states the officers did not have probable cause to believe that appellant had committed a felony; that appellant did not consent to the search. That as a result of the search, appellant was arrested and charged with a felony. That the search was illegal and in violation of appellant's rights guaranteed by the Constitution of the State of Indiana and the United States of America. That as a result of the search officers found and obtained evidence to be used at the trial of appellant, as follows:

"a. Statements and admissions solicited from the defendant by said officers at the defendant's home.

b. Statements made in the defendant's home to said officers by defendant's parents, Harry and Carolyn Grundy.

c. A bayonet covered with a substance resembling blood.

d. The body of a Negro woman.

e. Photographs of the defendant's home, the body discovered by the police, and stains upon the basement floor of defendant's home which resembled blood.

That each item of evidence so obtained was done so as a result of the illegal search."

Prior to trial a hearing was had on appellant's motion to suppress evidence. Appellant and appellee each produced evidence, at the close of all evidence appellant moved to amend

his motion to supress to include in the items to be suppressed the results of the autopsy. The court granted permission to so amend and then overruled appellant's motion.

At the trial appellant objected to testimony adduced by the state witnesses Bowman, Phillips and McAtee, each of whom was an Indianapolis Police Officer who was present at the search of appellant's home. In each instance the defense moved to suppress testimony from these three witnesses concerning what they saw, heard and observed during their search of the appellant's home on the basis that it was evidence obtained as a result of an illegal search and seizure. In each instance the court overruled appellant's objections.

Thereafter, the State having rested its case, appellant moved for a directed verdict of not guilty for the reason the State had failed to prove venue. The State asked and obtained leave to reopen the case for the purpose of proving venue, to which reopening appellant objected, the objection was overruled and the venue proved by the State, whereupon the State rested.

Appellant presented its evidence to which the State presented rebuttal evidence and the defense rested. Appellant tendered instructions numbered from 1 to 7 inclusive, all of which were given but No. 4 which was refused. Appellant's tendered instruction No. 4 is embodied in his motion for new trial and is here omitted.

The jury returned its verdict herein, which omitting caption and signature reads as follows:

"We, the jury find the defendant, James Maxey, guilty of Second Degree Murder as covered by the Indictment."

The court on May 4, 1967, rendered judgment on the verdict as follows:

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the court that the defendant be and hereby is sentenced to the Indiana State Prison during Life and costs."

May 23, 1967, appellant filed his motion for a new trial, which motion omitting title and signature reads as follows:

"MOTION FOR NEW TRIAL

Comes now the defendant in the above entitled cause of action and respectfully moves the Court for a new trial thereof on the following grounds and for the following reasons:

1. Irregularities in the proceeding of the Court and orders of Court and abuse of discretion by which the defendant was prevented from having a fair trial in this, to wit: the over-ruling of defendant's motion to suppress evidence which was filed prior to trial.

2. Irregularities in the proceeding of the Court and orders of Court and abuse of discretion by which the defendant was prevented from having a fair trial in this, towit:

(a) The Court erred in permitting the State to recall two (2) witnesses; first, Dr. Ransburg, the Deputy Coroner, who was recalled over defendant's objection; and, second, Indianapolis Police Department Sgt. McAtee who was recalled over defendant's objection and after the State had rest.

(b) The Court erred in permitting the State to reopen its case after the State had rest and after the Court had sustained defendant's motion that the Court instruct the jury to return a verdict for the defendant.

3. Error of law occurring at the trial in this, towit: the Court permitted Indianapolis Police Officer Bowman to answer the following question: (Questions or objections stated hereinafter are not verbatim but are stated in substance only.)

Question by State: After entering defendant's house, what did you see and do?

Objection by defendant: Defendant objects for reason that the officer's entry to defendant's house was illegal and what he saw, heard or found was evidence obtained as a result of an unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution and should be suppressed.

Ruling: Objection overruled.

4. Error of law occurring at the trial in this, to-wit: the Court permitted Officer Phillips to answer the following question propounded by the State over defendant's objection:

(Question, objection and ruling of Court are not set out verbatim, but are stated in substance only.)

Question by State: After you entered the defendant's house what did you observe and do?

Objection by defendant: Defendant objects for the reason that the officer's entry to defendant's house was illegal and what he saw, heard or found was evidence obtained as a result of an unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution and should be suppressed.

Ruling: Objection overruled.

5. Error of law occurring at the trial in this, to-wit: the Court permitted McAtee to answer the following question propounded by the State over defendant's objection: (Question, objection and ruling of Court are not set out verbatim, but are stated in substance only.)

Question by State: After you entered the defendant's house what did you observe and do?

Objection by defendant: Defendant objects for the reason that the officer's entry to defendant's house was illegal and what he saw, heard or found was evidence obtained as a result of an unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution and should be suppressed.

Ruling: Objection overruled.

6. Error of law occurring at the trial in this, towit: the Court erred in permitting Officers Bowman and Phillips and Sgt. McAtee to answer other questions propounded by the State concerning what they saw, heard or found after they entered defendant's home and searched it. That such answers were admitted over the objection of defendant for the reason that such evidence sought by the question was obtained as a result of an illegal search and seizure in violation of the Fourth Amendment of the United States Constitution and the Constitution of the State of Indiana.

7. Error of law occurring at the trial in this, to wit: the Court overruled defendant's motion made at close of State's case to strike all testimony of Officers Bowman and Phillips and Sgt. McAtee having to do with statements made to them either incriminating or exculpatory by the defendant at his residence, which said statements were admitted in evidence over defendant's objection that said statements were ob-

tained from defendant under the Fifth Amendment of the United States Constitution.

8. Error of law occurring at the trial in this, towit: the Court erred in refusing to give defendant's instruction No. 4, which is in words and figures as follows:

### Instruction No. 4

1. The Court instructs you that the using of a deadly weapon does not necessarily imply malice.

While the law presumes a sober man to intend what he does, the law does not presume a killing with a premeditated design. This, like every other element of murder in the first degree, is to be inferred by the jury from the facts proved beyond a reasonable doubt.

2. Malice may be proved by direct evidence such as prior threat, assaults, or seeking an opportunity to perpetrate the act. This is called 'express malice.'

Malice may also be implied from the act of killing, if the killing is done purposely and without legal excuse or reasonable provocation, if the act is perpetrated with a deadly weapon so sued as likely to produce death; the purpose to kill may be inferred from the act of killing.

On the other hand, if death, though wilfully intended, appears to have been inflicted immediately after some great provocation given by the deceased, which provocation is deemed by the law adequate to excite sudden and angry passions, this fact rebuts the presumption of malice; but the killing is still unlawful, because a man is bound to curb his passions and the offense is manslaughter.

COMPTON, CLARK AND SANDIFER
By: James E. Sandifer
Attorneys for Defendant

9. That the verdict of the jury is contrary to law, or is not sustained by sufficient evidence.

WHEREFORE, the defendant prays for a new trial in said cause."

Appellant filed with his motion for a new trial a memorandum in support of paragraph 9 thereof. Such memorandum, omitting heading, formal parts and signature, reads as follows:

"Defendant contends that the verdict of the jury was contrary to principles of law as applied to the issue in this case and that the verdict was not sustained by sufficient evidence. The evidence presented by the State showed that Mabel Maxey died on November 24, 1966, as a result of a laceration of the ascending aorta. That upon post mortem examination lacerations of the face numbering nine were found, and of the chest three. On cross examination the Coroner testified that at least three of the wounds on the face could have been caused by a fall or by some cause other than a stab with a knife. He further testified that any of the wounds found on the body could have been self-inflicted or inflicted as a result of a fight over a knife such as the one admitted in evidence as State's exhibit.

The State produced testimony from three police officers, two of whom testified that there were physical signs of a struggle or fight in the basement of defendant's home, and in fact a photograph introduced into evidence by the State demonstrates that a cabinet at the bottom of the basement stairs was leaning away from the stairs as if pushed over during a struggle. These same three officers testified that the defendant stated to them in effect that he had killed his wife, the only thing he ever loved. The officers testified that a military type bayonet was found in the basement and that upon examination it was found to have on the blade thereof, blood of the same type as the decedent's. No test was made of defendant's blood type and it is unknown if his blood was the same as that on the bayonet.

At no time during the trial did the State introduce evidence to show that the defendant held the knife in his hand and used it against the decedent. There was no evidence of fingerprints existing on the knife nor was there evidence that any test for fingerprints had been made. There was a complete lack of evidence to link the knife to the defendant other than the fact that it was believed to be the weapon and defendant's admissions to the police.

The above is a brief statement of what the State's evidence was upon which defendant was convicted of second degree murder. The defendant's evidence showed that the knife in question belonged to the decedent and that it had not been seen lying around the house and particularly in the basement.

The defendant's evidence further showed that the decedent shortly before she died had called the defendant's mother and had threatened to kill the defendant if his

mother didn't come get him. The defendant recalls that his wife was arguing with him when he came home from work that morning. He recalls her shoving him in their kitchen. He further recalls starting down the stairs to the basement to go to the bathroom and her shoving him down the steps. Following that point in time the defendant recalls nothing further until he is standing at the end of the basement opposite the stairs and he can see Mabel Maxey lying on the floor.

The defendant's witness, Dr. E. Rogers Smith, a psychiatrist, testified that defendant suffered from amnesia and could not recall the facts of what happened at the foot of the basement steps.

In view of all the evidence as thus above summarized, defendant contends that the verdict of the jury was contrary to law or not sustained by sufficient evidence in this, to wit:

1. That there was no evidence of malice on the part of defendant aside from the facts showing that the decedent was killed by a knife and that defendant made admissions of killing the one he loved. There was no proof of an intentional use of the knife by defendant. *Clem* v. *State* 31 Ind. 480.

2. That there was no evidence that defendant's admissions were statements of fact or conclusions based upon the fact of seeing his wife lying on the floor. The admissions in and of themselves do not answer the question was the killing in self-defense, in a sudden heat, or with malice.

3. There was no evidence before the Jury to show that the defendant held or used the suspected weapon.

4. There was no evidence that the defendant inflicted any or all of the decedent's wounds and in particular the fatal wound. From the evidence, any or all of the wounds could have been self-inflicted or inflicted as a result of a fight.

5. There was no evidence of motive on the part of defendant, other than the fact that he acted in the defense of himself when Mable Maxey assaulted him.

6. Based upon the statements above as to the insufficiency of the evidence, there was a lack of evidence to prove the defendant guilty of murder in the second degree and thus that conviction was contrary to law. *Deal* v. *State,* 140 Ind. 354, 39 N. E. 930.

7. The evidence taken as a whole points to the conclusion that the defendant acted in self-defense which fact would

exonerate him in this case. *Brannin* v. *State,* 46 N. E. 2d 599, 221 Ind. 123.

8. There is a reasonable doubt as to which, if any, of the offenses contained in the indictment the defendant committed and therefore his conviction was contrary to law. *Newport* v. *State,* 39 N. E. 926, 140 Ind. 299.

9. From the evidence taken as a whole, there were two reasonable interpretations that would have been found by the jury, one pointed to defendant's guilt and the other pointed to his innocence by reason of self-defense and that it was the duty of the jury to adopt that interpretation pointing to defendant's innocence and thus their verdict was contrary to law. *White* v. *State,* 79 N. E. 2d 771, 226 Ind. 309.

10. That the State of Indiana failed to carry forward its burden of proof beyond a reasonable doubt and therefore the verdict was contrary to law."

On May 24, 1967, the court overruled appellant's single specification:

"1. The Court erred in overruling appellant's motion for a new trial."

The evidence in the record in the case at bar covers many pages of record, far too many to incorporate in an opinion, even the appellant's summary of the evidence contained in his brief is too long to incorporate herein, consequently we have attempted to incorporate in the summary of the evidence most favorable to the appellee the bare minimum needed to show the facts here in issue, as follows.

On November 24, 1966, about 7:29 a.m. Indianapolis Police Officers Bowman and Phillips received a radio call to proceed to the 1800 block of Koehne Street to investigate a disturbance. They parked on the East side of Koehne opposite 1812 Koehne. As they started to emerge from the car, they saw a colored woman standing on the enclosed porch of 1812, with a door open. She said "Hurry, my son has killed his wife." When they arrived at the house, she repeated that statement.

The woman, Mrs. Carolyn Grundy, the mother of appellant James Maxey, led the officers into the house. The officers followed Mrs. Grundy into the house and saw the appellant in the kitchen with Harry Grundy, Carolyn's husband, and stepfather of appellant.

The appellant turned around, thrust his arms out and said, "Take me away. I just killed my wife."

Officer Phillips went to the basement to see if the woman was still alive. He saw the body of a colored woman. Shortly after, Officer Bowman also went to the basement and saw the deceased, Mabel Maxey, lying on her back with arms extended. The body was about five feet from the stairs.

While in the basement, Harry Grundy volunteered to show Officer Bowman where the knife was, and led the officer to a washing machine about twenty (20) feet from the body. The officer observed a twelve (12) inch blade Army bayonet on top of the machine. About ten (10) inches of the blade was covered with a red substance resembling blood. Officer Phillips also observed the blade and the blood like substance on it. Later after Sgt. McAtee of Homicide arrived, the Sgt. took the blade upstairs to take it to his car and preserve it as evidence, and as he walked through the kitchen the appellant said "that's what I killed her with." Subsequently, Sgt. Kerkoff, assigned to the laboratory of the Indianapolis Police Department, examined a dried blood sample that Sgt. McAtee turned in to him and a liquid blood sample. The tests showed that the blood of both samples was "O" type of human origin.

Appellant testified at the trial that he had seen the knife around the house but that Mabel, his wife, owned it. The blade or knife was admitted into evidence as State's Exhibit Two.

Officer Bowman arrested appellant on a preliminary charge of murder, informed him of his constitutional rights whereupon appellant said "I will tell you anything, I've killed the thing I loved the most, and I have to be punished for it."

Officer Phillips heard this conversation, and he heard appellant say that he'd done it, there was no use saying anything different, and he wanted them to know about it.

Sgt. McAtee also heard appellant say that he killed the thing he loved the most. Despite the sergeant's admonitions to appellant about saying anything, the appellant kept repeating that statement. Appellant also told the sergeant that there was no sense denying it, and that "I'll tell you all about it."

None of the three officers, Bowman, Phillips and McAtee, observed any cuts, bruises or marks on appellant. Officer Bowman observed specks of a red substance on appellant's shirt and pants. Officer Phillips saw blood on his clothes.

Dr. Ransburg, pathologist, who is deputy coroner, testified that he performed an autopsy on the deceased at the morgue.

He found twelve wounds, nine to the face and head, and three on the anterior chest. Of the wounds on the left side of the head, two lacerations were fairly deep and went to the bone. Some of the lacerations were about the mouth. There were two lacerations of a jagged nature on the left ear and behind it.

One stab wound on the chest was fairly superficial and not deep. The third wound on the anterior chest had penetrated through the chest wall, missing a rib, and penetrated to depth of the hilum of the lung, for a depth of six inches.

He found a laceration of the aorta, through and through, causing bleeding into the thoracic cavity and sac that holds the heart, and this caused her death. He stated that the laceration was due to an instrument at least six inches long and one inch wide. He was shown State's Exhibit Two (the blade) and opined that the instrument could have administered the wounds.

The doctor also found abrasions on the inner lip, right side, a bruised area on the right side of head and a black eye.

He believed that the lacerations would have to have been caused by a sharp pointed object. He also said it was possible that some of the lacerations could have been self-inflicted, and some by falling and some by self-infliction during a scuffle.

He did not think it possible, if the victim had the knife in her possession at all times, the two additional wounds described by him in his return to the witness stand for omitted questions could have been caused by falling on the blade.

The appellant testified he and his wife had been married since August 1, 1966; that they had a good relationship for the first month and a half; that thereafter differences leading to arguments about children, bills, etc. arose; that neither of them had been violent; that the knife belonged to his wife, and that he had seen it around the house; that they had an argument on the morning of November 24, 1966, when he came home from work sick; that he heard her call his mother on the telephone and tell her to come and get him before she killed him; that she had been drinking and started shoving him; that he started to go downstairs to the toilet in the basement; that she followed him; that he doesn't know if she had a knife in her hand or not; that she shoved him and to break his fall he grabbed her and fell down the stairs. He doesn't remember what happened after that.

The case at bar presents a number of questions that require determination on what might well be called a piecemeal approach before we even get to the merits. In order to make such a determination we deem it necessary to set out in orderly fashion those questions so presented.

1. Appellant challenges the legality of entry and search of his property by the officers on the theory that the entry and search preceded his arrest, that the officers had neither a warrant for his arrest, a search warrant, or his permission to enter or search the premises; that the officers did not have probable cause to believe that a felony had been committed therein and that he had committed it; that at the time the

officers Bowman, Phillips and McAtee were not faced with an immediate crisis which afforded them neither time nor opportunity to obtain a search warrant;

2. Appellant claims prejudicial error resulting from the trial court's overruling of his motion to strike the testimony of police officers relative to admissions made by appellant to such officers following custodial interrogation of appellant without the State showing he voluntarily, knowingly and intelligently waived his right against self incrimination;

3. Appellant claims also an abuse of discretion on the part of the trial court and prejudicial error resulting therefrom by virtue of its permitting the State to reopen its case in order to prove venue after it had rested and the court had indicated it was going to sustain appellant's, motion for a directed verdict of not guilty.

We will discuss and dispose of the issues presented at 1, 2 and 3 before proceeding to discuss the issues presented by the assigned error although in some instances they will overlap.

In answering point 1 above we will briefly refer to the record evidence. That discloses that on the morning of November 24, 1966, the decedent called appellant's mother, Carolyn Grundy, on the telephone and inter alia said, "This is Mabel." Mrs. Grundy asked her what she wanted and the decedent said, "You better come over here and get your crazy son, if you don't I am going to kill him." That conversation took place sometime between 5 and 6 a.m. Sometime between 6:30 and 7:30 that morning Mrs. Grundy and her husband went to the son's home at 1812 Koehne Street. Her husband parked the car and she went to the door and knocked, no one answered so she looked through the side window and saw her son, the appellant, sitting in the kitchen with his head down on the kitchen table. Mrs. Grundy tried the door, it was unlocked and she went in. Her son said, "Hello Mother;" she asked where his wife was and got no answer. Mrs. Grundy then went to the upstairs bedroom and didn't see her daughter-

in-law. She then came downstairs and looked in the downstairs bedroom and she wasn't there. In the meantime her husband, Harry Grundy, had come into the house. Mrs. Grundy then went back to the kitchen and again asked her son where Mabel was; without saying anything appellant took his mother by the hand, led her to the steps and pointed down into the basement where she "saw Mabel laying at the bottom of the steps." Mrs. Grundy then went back to the dining room and called the police, telling them there had been a fight and to send the police out. She got the numbers mixed up and said to send the police to 1218 Manlove, she then went out on the porch and waited about five (5) minutes, then came back and called the police again, this time giving them the correct number. The police arrived in about five minutes after the second call. The property at 1812 Koehne was owned by James Maxey, and occupied by him, his wife and one of his children and two stepsons, children of Mabel.

Mrs. Grundy was standing on the front porch when the police arrived. They said, "Did you call the police?" She said, "Yes." They said, "Well I don't see no fight and I don't see no sign of a fight." She said, "Well come with me."

The police followed Mrs. Grundy into the house and into the kitchen where appellant was sitting. About this time the evidence becomes conflicting. The police testified Mrs. Grundy told them to hurry as her son had killed his wife, she denied that statement and said she had merely told them there had been a fight. The police testified the first thing appellant did and said, "He turned around as soon as he saw us, he thrust his hands out towards us and said take me away. I just killed my wife." The police told appellant to calm down and asked him where she was, he said she was down in the basement; one of the officers went down, looked, came up and told the other officer to go down and look; he did, came back up and arrested appellant. Appellant took the stand in his own behalf and did not deny the statement of the officers but said he had no recollection of such statements.

It is admitted that entry to appellant's home preceded his arrest; that the officers did not have either a search warrant for the premises or a warrant for appellant's arrest; that he did not personally give them permission to enter or to search the house before their entry.

I think that at this point this question of entry and the legality or illegality thereof depends on the construction given the acts and statements of Carolyn Grundy. Admittedly she was neither the owner nor occupant of the premises at 1812 Koehne Street; her son, the appellant, was grown with a family and not a minor subservient to her will, and perhaps not bound by her actions or statements. Yet here is the mother, present at her son's home at the request of the now dead wife who called her "to come and get your crazy son before I kill him." Subsequent to that call the son told the mother he was ill. The mother seeing the wife lying at the foot of the basement stairs on a concrete floor immediately, without comment or hindrance from the son, called the police, not once but twice, waited out on the porch for them to arrive, told them she called them and either told them "well come with me" and took them inside; or the other version, that of the police, said, "Hurry, my son killed his wife" and took them inside. The police version of what happened is that when they first saw appellant in the kitchen he admitted the killing and said to take him away. On the facts, *as they exist in this case,* it is my opinion that this entry by the police was a lawful entry of appellant's property, for three reasons:

1. Mrs Grundy identified herself as the person who called the police, was acting with apparent authority when she talked to them and invited them to enter the house;

2. Appellant at the time he first saw the police interposed no objection to their presence and according to sworn testimony of the officers not only immediately admitted killing his wife but after being admonished by both the police and his mother, not to say anything, continued to repeat his statement about

the killing and at the trial did not deny the statements made by the officers;

3. The search, other than the question "where is she," was made after appellant had been arrested when the officers looked down the stairs and saw Mabel lying on the concrete basement floor at the bottom of the stairs.

I am of the opinion we have covered in the discussion above all the questions raised under point one (*supra*). I am also of the opinion the points raised under point 2 above are answered by reference to the record which shows clearly that appellant was advised by the police of his right to counsel, right to remain silent, etc., and at his home after the arrest as disclosed by the record in spite of admonitions he continued to volunteer information that he killed his wife, that exhibit 2 was the instrument used in such killing. I am of the opinion he voluntarily and knowingly waived his right against self-incrimination, as to whether or not it was done intelligently I have no way of knowing and on that point express no opinion.

With reference to point three, it has long been held, by many cases, that the action of the court in permitting the State to reopen its case after it had rested was a matter of discretion for the court and unless a clear abuse was shown this Court would not interfere. I point out that the court had not sustained appellant's motion for a directed verdict but only indicated it considered the motion meritorious, after that the court evidently reconsidered its statement and permitted the State to reopen the case for omitted evidence and to prove venue. I point out that the appellant waives this alleged error by proceeding to introduce evidence after his motion for a directed verdict was overruled. *Hoy* v. *State* (1949), 227 Ind. 346, 349, 85 N. E. 2d 493; *Mobley* v. *State* (1949), 227 Ind. 335, 339, 85 N. E. 2d 489; *Hansen* v. *State* (1952), 230 Ind. 635, 642, 106 N. E. 2d 226; *Alstott* v. *State* (1933), 205 Ind. 92, 185 N. E. 896.

I am more concerned with the questions presented by grounds 8 and 9 of appellant's motion for new trial and will discuss them together. Appellant predicates error on the refusal of the trial court to give the jury his tendered instruction No. 4. A careful reading of the evidence in this case may well lead one to conclude that appellant did administer the fatal blow, indeed by his own admission such conclusion would only be logical, yet the evidence is uncontradicted that the deceased that morning shortly before the culmination of this tragedy made a threat upon the life of appellant and pushed him down a flight of stairs. Thus there is in the record evidence to show provocation of appellant which may have created a sudden and angry passion which could reduce the killing to manslaughter. The evidence being in the record, it was necessary that the jury be instructed on the subject of sufficient provocation reducing the crime from murder to manslaughter. *Williams* v. *State* (1925), 196 Ind. 84, 147 N. E. 153.

Our statute which states the elements of the crime of Second Degree Murder is as follows:

> "Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and, on conviction, shall be imprisoned in the state prison during life." Burns' Ind. Stat. Anno. (1956 Repl.) § 10-3404; Acts 1905, Ch. 109, Sec. 350, p. 584.

Thus, the necessary elements of Second Degree Murder are:

1. a killing of decedent;
2. that it was done purposely;
3. that it was done maliciously.

All of the foregoing elements are for the jury to determine. *Landreth* v. *State* (1930), 201 Ind. 691, 171 N. E. 192.

The evidence is silent as to where the knife came from, who originally secured it, who handled it, whose finger prints were on it and who held it during the apparent fight. Appellant

testified that he didn't find the knife and doesn't know who did, but that it was decedent's knife.

There is no evidence that the knife was ever in the possession of appellant. To find that it had been, would be only an inference drawn from the admissions made by appellant.

The statements of admission made by appellant that he killed his wife with the bayonet do not answer the questions, under what circumstances. In self defense, in a sudden heat, or purposely and with malice? Dr. Smith testified that appellant concluded that he had killed decedent because he was the only person there.

While purpose and malice are questions of fact for the jury to determine, such jurisdiction of the jury must be supported by substantial evidence of probative value. *Miller* v. *State* (1962), 242 Ind. 678, 181 N. E. 2d 633.

There was no evidence of sufficient probative value at appellant's trial for the jury to have found purpose and malice.

While purpose and malice can be inferred from the circumstances and use of a deadly weapon and act of killing, there is no evidence in this case that appellant used the deadly weapon or that he killed his wife other than his admissions. While inference of purpose and malice may be thus inferred, appellant introduced evidence to rebut the inference as he may do. *Landreth* v. *State* (1930), *supra*.

Such evidence was that his wife had picked a fight with him and shoved him down the basement steps after having threatened to kill him. The bayonet could just as easily have been in her possession as appellant's for the deputy coroner, Dr. Ransburg, testified that the wounds to deceased could have been caused even if she had held the bayonet.

Apparently the only case in point is the case of *Futch* v. *State*, 90 Ga. 472, 16 S. E. 102, which held: "If the accused admits the killing with a deadly weapon but adds an explanation which might negative malice, no presumption that the homicide was murder would arise on such admission."

I am inclined to agree with counsel for appellant that the jury was not justified in finding the appellant guilty of Second Degree Murder by finding purpose and malice from his bare naked admission that he had killed his wife in view of the fact that appellant, by the evidence of threats on his life and physical violence having been done him, rebutted the inference of purpose and malice.

In my opinion the verdict of the jury is not sustained by sufficient evidence of probative value on the questions of purpose and malice and therefore the verdict is contrary to law. Finally it is my opinion that the court committed reversible error in refusing to give appellant's instruction No. 4.

The judgment below should be reversed, this cause remanded to the trial court with instructions to vacate the judgment below and to grant appellant a new trial.

NOTE.—Reported in 244 N. E. 2d 650.