**Raymond L. CRONK,
Defendant-Appellant,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

No. 1–782A161.

Court of Appeals of Indiana,
First District.

Jan. 11, 1983.

Harold E. Amstutz, Lafayette, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Stephan E. Wolter, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Raymond L. Cronk was convicted by jury trial of resisting law enforcement, a class A misdemeanor;[1] disorderly conduct, a class B misdemeanor;[2] attempted arson, a class B felony;[3] and possession of a bomb, a class C felony.[4] He was fined $500 and sentenced to six years on the attempted arson charge;[5] sentenced to 180 days on the disorderly conduct charge[6] and to one year on the resisting law enforcement charge;[7] all of which sentences were suspended and Cronk was placed on probation for five years. On the charge of possession of a bomb, Cronk was fined $300 and costs and sentenced to the Indiana Department of Correction for a term of two years,[8] which sentence was ordered executed. Cronk now appeals. We affirm.

## FACTS

The evidence most favorable to the state reveals that on August 22, 1981, Cronk had chained himself to a cannon on the courthouse lawn in Crawfordsville, was exhibiting two signs bearing the words, "No Justice, No Rights," and had a piece of plywood and a sleeping bag in close proximity to the cannon. Police officers asked Cronk to unlock the chain, leave the immediate location, and continue his protest by marching on the sidewalk. When he refused, the officers cut the chain, handcuffed Cronk, and placed him in custody. As the officers were escorting Cronk to the police car, he turned back towards the cannon and yelled that if the officer who was standing on the plywood stepped off he would be blown up and that there was a bomb under the board. The officers then returned him to that location and asked him about the bomb, its location, and how it was detonated. Cronk stated that the officer could step off the board safely because the bomb would not explode unless the string was pulled. Upon removal of the piece of plywood, a red string was observed protruding from a small mound of freshly dug earth. Cronk indicated this as the location of the bomb and offered to remove it if the officers would remove the handcuffs. The officers declined his offer and Cronk was taken to jail.

At the jail, Cronk was questioned further about the bomb and he drew a diagram of it which was later turned over to Indiana State Police officers who were called to the scene. State police troopers Strange and Morrison, who were trained in explosives, dismantled the bomb. They described it as a pipe bomb containing a spring detonating mechanism, the live primer from a .12 gauge shotgun shell, a substance which the troopers, based on their experience, believed to be gunpowder from shotgun shells, and a pinkish powder believed to be ammonium nitrate. The officers were of the opinion that the first stage of the bomb was capable of exploding if the string were pulled and that such explosion would have endangered anyone within fifteen to eighteen feet of such explosion. The ammonium nitrate would not have exploded because it had not been treated with a petroleum product which is necessary to render it explosive.

1. West's AIC § 35–44–3–3 (Supp.1982–83).

2. West's AIC § 35–45–1–3.

3. West's AIC § 35–43–1–1(a)(2) (Supp.1982–83) arson; § 35–41–5–1 attempt.

4. West's AIC § 35–23–3–1.

5. West's AIC § 35–50–2–5, penalty for class B felony.

6. West's AIC § 35–50–3–3, penalty for class B misdemeanor.

7. West's AIC § 35–50–3–2, penalty for class A misdemeanor.

8. West's AIC § 35–50–2–6, penalty for class C felony.

The state troopers then went to the jail and after advising Cronk of his *Miranda* rights,[9] questioned him and also obtained a consent to search his home. Cronk told them about the bomb and that he had intended to blow himself up. A search of his home revealed a number of shotgun shells and a quantity of ammonium nitrate.

Shortly before being given *Miranda* warnings by the state troopers and signing a waiver of such rights and the consent to search form, Officer Newlin had advised Cronk of his *Miranda* rights and attempted to have Cronk sign a waiver. However, Cronk then contended he did not believe he had such rights and refused to sign the waiver. It is undisputed that no *Miranda* warnings were given at the scene or at the jail prior to the diagram being drawn.

Cronk testified in his own defense and admitted making and planting the bomb. However, he asserted it was arranged so that it could not be detonated and would not have exploded had the string been pulled.

## ISSUES

Cronk raises the following issues which we have renumbered and restated:

1. Did the trial court err in admitting statements made by Cronk at the scene and after his arrest?

2. Did the trial court err in admitting statements made by Cronk at the jail after his arrest?

3. Did the trial court err in overruling Cronk's objections to comments by the prosecutor during final argument?

4. Was there sufficient evidence to support the convictions of possession of a bomb and attempted arson?

## DISCUSSION AND DECISION

*Issue One*

Cronk maintains it was error to admit testimony by Officers Lohorn, Barton, and Newlin concerning statements made at the scene by Cronk after his arrest. Specifical- ly, he claims the statements concerning the presence of the bomb, its location and method of detonation were obtained by means of custodial interrogation without *Miranda* warnings first having been given. Thus, he argues, such statements were inadmissible under *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and as adopted in this state. We disagree.

It is clear that *Miranda* applies only to custodial interrogation. *Johnson v. State,* (1978) 269 Ind. 370, 380 N.E.2d 1236; *Manns v. State,* (1981) Ind.App., 419 N.E.2d 1313; *Pitts v. State,* (1980) Ind.App., 410 N.E.2d 1387. Cronk's volunteered statements that if the officer stepped off the board it would explode and that there was a bomb under the board were not elicited through custodial interrogation. Such spontaneous voluntary statements are not within the purview of the *Miranda* safeguards. *Johnson; Manns; Pitts.*

When Cronk was returned by the officers to the location of the cannon, he already had been arrested and handcuffed and clearly was in custody. Assuming his statements that the officer could step off the board safely and concerning the location and method of detonation of the bomb were the products of custodial interrogation, ordinarily *Miranda* would apply. However, we are of the opinion that such is not the case here. "An interrogation occurs only when officials intend to elicit, by whatever means, substantive evidence concerning criminal activity." *Nading v. State,* (1978) 268 Ind. 634, 639, 377 N.E.2d 1345, 1348. Here, the questioning about the location and method of detonation of the bomb was not intended to elicit incriminating evidence. Rather, such inquiries were for the purpose of obtaining information necessary to meet an existing emergency and to remove a present danger. Thus, it might be argued that such questioning was not within the definition of interrogation requiring that *Miranda* warnings first be given. Further, for reasons hereinafter stated, we believe such questioning was within a neces-

9. *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

sary exception to the *Miranda* requirements.

The officers found themselves presented with an emergency situation possibly life-threatening or likely to cause personal injuries or serious property damage. They had been informed of the presence of a bomb. They were themselves possibly within a danger zone of grave consequences, as were Cronk and any other persons who came upon the scene. At this point, they did not know of the size of the bomb, its manner of detonation, or probable impact. They returned Cronk to the scene and obtained from him pertinent information concerning the location and method of detonation of the bomb. We believe they had a right, even a duty, to make such inquiry of Cronk and that they did not have to risk possible death or serious bodily injury while they read Cronk his *Miranda* rights or waited for Cronk's lawyer to arrive from another city.[10] Under the circumstances of this case, we believe the *Miranda* rule must yield to the emergency.

While this specific issue has not been addressed by the courts in this state, we believe there is ample authority in analogous situations and from other jurisdictions to support our decision. In the important area of Fourth Amendment rights, both the Supreme Court of the United States and our supreme court have recognized certain emergency exceptions to the search warrant requirement. *Mincey v. Arizona*, (1978) 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290; *Michigan v. Tyler*, (1978) 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486; *Bruce v. State*, (1978) 268 Ind. 180, 375 N.E.2d 1042, *cert. denied* 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662; *Maxey v. State*, (1969) 251 Ind. 645, 244 N.E.2d 650, *cert. denied* 397 U.S. 949, 90 S.Ct. 969, 25 L.Ed.2d 130.

In *Tyler*, it was held that fire fighters at the scene of a fire could enter upon the premises without a warrant, at the time of the fire and for a reasonable time thereaft-er, to determine the origin of the fire and could seize containers of flammable material found therein and such was admissible in evidence. The court, however, ruled evidence gained from later warrantless entries inadmissible as detached from the initial exigency. In *Mincey*, the Supreme Court recognized the exception but found no sufficient emergency existing to make it applicable. However, Justice Stewart wrote:

"We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. Cf. *Michigan v. Tyler, supra,* [436 U.S.,] at 509–510, [98 S.Ct., at 1950–1951]. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' *Wayne v. United States*, 115 U.S.App. D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Michigan v. Tyler, supra,* [436 U.S.,] at 509–510, [98 S.Ct., at 1950–1951]; *Coolidge v. New Hampshire*, 403 U.S. [443] at 465–466, [91 S.Ct. [2022] at 2037–2038 [29 L.Ed.2d 564]]"

(Footnotes omitted.) 437 U.S. at 392–93, 98 S.Ct. at 2413, 57 L.Ed.2d at 300.

In *Bruce*, Justice DeBruler, speaking for our supreme court, said: "Emergency circumstances involving injury or imminent danger to a person's life justify governmental intrusion for the purpose of preventing further injury or aiding those injured. [Citations omitted.]" 268 Ind. at 217, 375 N.E.2d at 1062. And, in *Maxey*, Justice

---

**10.** The officers admitted that Cronk told them he was awaiting the arrival of his lawyer. However, the evidence shows that Cronk told a radio newscaster that his lawyer was supposed to have been there the preceding day. Record at 109. Thus, it is clear that Cronk had not called his lawyer concerning the matter at hand.

Hunter observed that while a search warrant generally is required to allow police officers to enter a private dwelling, a well recognized exception to that rule permits an entry under emergency circumstances. 251 Ind. at 650, 244 N.E.2d at 653.

We believe these same principles which permit police officers to enter private property without a warrant in emergency situations, albeit limited to the duration of the emergency, apply with equal force to permit limited questioning of a person in custody to meet with and remove an emergency with the potential for causing death, bodily injury, or serious property damage without first giving *Miranda* warnings. In this view, we are supported by decisions from other jurisdictions.

In *Commonwealth v. Hankins,* (1981) 293 Pa.Super. 341, 439 A.2d 142, police came upon a store robbery in progress and saw patrons, including a woman and baby, lying on the floor. The officers knew the robbers were armed. When the appellant, whom the officers had observed peeping out a window, came out with his hands raised, he was asked, "Where are the others?" The court said it would be absurd to conclude this question was asked for the purpose of eliciting a confession and stated: *"Where a question is necessary to insure the safety of bystanders or police officers, and time is a crucial factor, we feel that there is a sufficient state interest to override the necessity of reading Miranda warnings."* 439 A.2d at 144. The court observed further that "[n]o one could dispute the obvious peril to officers and bystanders." 439 A.2d at 145.

In *United States v. Castellana,* (5th Cir. 1974) 500 F.2d 325, the defendant was charged and convicted of a firearms violation. FBI agents, armed with a search warrant, had gone to Castellana's store where he was suspected of running a gambling operation. While preparing to read the warrant, an agent asked Castellana if he had any weapons within reach. He pointed to a desk. A search of the desk revealed four handguns which were removed. The agent asked where he got the guns and was advised they were taken in on a loan. The court held the question and answer about the weapons was permissible, even though no *Miranda* warnings had been given, but that the statement of where the guns were obtained was inadmissible. The court there said:

> "Assuming Castellana was 'in custody' under inherently coercive conditions when [the agent] asked his questions, *Miranda* was not infringed, for [the agent] was not interrogating Castellana in an attempt to elicit evidence of a crime. The safety of the operation was [the agent's] primary concern, he testified, and the very form of his first inquiry— weapons within reach—shows it was limited to his proper concern.... We find ourselves unable to condemn, after the fact and on grounds of some delicacy, such mild prophylactic measures reasonably calculated to ensure the safety of the officers, the subject, and others on the scene as well. To be sure, the court below concluded that the agents did not feel physically threatened by Castellana, but in our view the mild measures adopted were justified by a reasonable prudence under the circumstances and did not require an actual fear of imminent harm to validate them."

(Footnotes omitted.) 500 F.2d at 326–27.

We believe the facts of this case to be squarely within the *Miranda* exception delineated by *Hankins* and *Castellana.* The officers clearly were faced with an emergency situation, having been informed of the presence of a bomb. There was indeed an obvious peril to them and others. Time may well have been of vital concern. Thus, the questioning of Cronk, under the circumstances, not for the purpose of eliciting inculpatory statements or incriminating evidence, but to obtain information necessary to remove the danger, was indeed justified by reasonable prudence. *Miranda* was not infringed. That incriminating evidence was obtained in the course of carrying out such reasonably prudent measures in order to meet the existing emergency and to insure the public safety does not render such evidence inadmissible.

Therefore, we hold there is an emergency exception to *Miranda* where questioning is necessary to insure the safety of the public, the officers, or the accused and time is a crucial factor. Under these limited circumstances, there is a sufficient state interest to override the necessity of *Miranda* warnings. However, we wish to make it clear that this emergency presenting a threat to life or body or of substantial property damage, and not for the purpose of securing incriminating evidence under the guise of protection of the public. Such exception exists no longer than the emergency.

*Issue Two*

Cronk next argues it was error for the court to admit evidence of his statements at the jail, prior to his having been given *Miranda* warnings, relative to the bomb and the diagram. First, we observe that the court properly and wisely held that the emergency had expired at that time and that Cronk's statements at the jail were inadmissible. When the officers who dismantled the bomb testified they had a diagram, no mention was made of the source of the diagram, and no objection was made. The statement to which Cronk objects came on redirect examination of Officer Newlin wherein the following colloquy occurred:

"Q. What did Mr. Cronk say about setting off the bomb?

"A. Mr. Cronk stated that the bomb was for his own purposes, that, in my mind, I knew what he meant by it. He didn't say it, but—"

Record at 98. The court sustained Cronk's objection to the conclusory portion of the answer.

Just immediately prior to this redirect examination, Cronk's counsel asked Officer Newlin on cross-examination: "Did Mr. Cronk ever make the statement to you that he was going to set off that bomb?" The witness responded: "Not in those words, no."

■ This was proper redirect examination of the witness. Once a defendant inquires into a subject on cross-examination, the state is entitled to probe the matter further on redirect to avert a false or misleading impression. *Estep v. State,* (1979) Ind., 394 N.E.2d 111. Once a party opens a subject on cross-examination, the opposing party may pursue that subject on redirect examination. *Woodford v. State,* (1980) Ind., 405 N.E.2d 522. Cronk, having opened this issue, could not have it closed at his convenience. *Drollinger v. State,* (1980) Ind., 409 N.E.2d 1084. There is no error on this issue.

*Issue Three*

Cronk claims error in the prosecutor's comment during final argument:

"If in fact he had created a device that would not blow up, he would be making statements I think that is contrary to what he said here in Court today. And then he drew this picture and in the end Office Newlin come [sic] back to tell us about this, this picture. Nowhere in the course of this interview with Officer Newlin, or with Mr. Strange, or with Mr. Morrison or anyone did he say anything about having adjusted this nut here so that there was no firing pin. He never said that until today, and I submit that is because he never thought of it until today."

Record at 301. Counsel made the following objection:

"To which we would object, your Honor. The Statute provides that the State presents the evidence first and the defendant can only present its evidence after the State with no opportunity for the defendant to present it prior to the time he can, which the State is making comment upon that, it is unfair and prejudicial to the defendant."

Record at 301–02.

■ Cronk now argues on appeal that the prosecutor's comment was an improper comment upon his silence at the time of arrest and prior to trial. However, that was not the basis of his objection at the trial. Where the objection stated at trial does not correspond to the objection stated on appeal, the issue is waived. *Reliford v. State,* (1982) Ind., 436 N.E.2d 313; *Lyda v. State,* (1979) Ind., 395 N.E.2d 776.

*Issue Four*

Finally, Cronk contends the evidence was insufficient to sustain the convictions for possession of a bomb and attempted arson. Specifically he contends there is no evidence the device contained explosives, and, as to the attempted arson charge, there is no evidence of an attempt to knowingly or intentionally damage property under circumstances that endanger human life. We disagree as to both contentions.

We must reiterate the well established rules of appellate review of sufficiency of evidence questions. We do not reweigh the evidence or determine matters of credibility of witnesses. Rather, we look only to that evidence favorable to the state. If from that viewpoint there is substantial evidence of probative value to support the verdict, the conviction will be upheld. *Pinkston v. State,* (1982) Ind., 436 N.E.2d 306; *Allen v. State,* (1980) Ind.App., 406 N.E.2d 976.

Here, both troopers Strange and Morrison testified as to the composition of the bomb, and that based upon their training and experience, they were of the opinion it contained gunpowder. Both testified in their opinion the first stage of the bomb would have exploded had the string been pulled. Strange testified an explosion of the bomb would have created a danger zone with a radius of 15 to 18 feet. This evidence was sufficient to establish that the bomb contained explosives and that a danger to human life was presented.

The arson statute insofar as relevant here provides:

"(a) A person who, by means of fire or explosive, knowingly or intentionally damages:

.    .    .    .    .

(2) property of another under circumstances that endanger human life; ...

. . . .

commits arson, a Class B felony...."

West's AIC § 35–43–1–1 (Supp.1982–83). Cronk is charged with attempting that crime. To be guilty of an attempt, the actor must act with the culpability required for the commission of the crime and engage in conduct constituting a substantial step toward committing the offense. West's AIC § 35–41–5–1.

It is clear that Cronk planted a device which the jury could have found to contain an explosive, which was capable of being exploded, thereby creating a danger zone of 15 to 18 feet wherein fragmentation of the bomb could occur. In *Pedigo v. State,* Ind. App., 443 N.E.2d 347 (1982), Judge Neal wrote:

"Pedigos argue that the evidence is insufficient to establish that human life was endangered. We disagree. A bomb was exploded in the van on a residential street by the Theriac home and pieces of metal, glass, shrapnel and debris struck the house, one piece penetrating the siding. Persons in front of the window in the house, or innocent pedestrians could have been fatally injured. The gas tank of the van could have exploded causing a major fire. These matters, in our opinion, endanger human life. Endanger means to expose to harm. *Webster's Seventh New Collegiate Dictionary* (1972)."

At 350.

■ We view our statement in *Pedigo* as dispositive of the issue of whether human life was endangered. The evidence met the test of sufficiency as measured by our standard of appellate review.

Judgment affirmed.

ROBERTSON, P.J., and NEAL, J., concur.