HILL *v.* STATE OF INDIANA.

[No. 368S54. Filed October 9, 1969. No petition for rehearing filed.]

*William C. Erbecker, James Manahan, George W. Hand* and, of counsel, *Erbecker & Manahan,* of Indianapolis, for appellant.

*John J. Dillon,* Attorney General, *Douglas B. McFadden,* Deputy Attorney General, for appellee.

HUNTER, J.—Appellant in this case was charged with first degree murder to which he entered a written plea of not guilty together with a special plea of insanity. Trial by jury in the Henry Circuit Court resulted in a conviction of murder in the second degree and sentence to life imprisonment.

In his motion for a new trial, appellant assigns error on fifty-two specific points, consisting primarily of alleged error in the refusal of the trial court to give appellant's tendered instructions, in addition to the assertion that the verdict was contrary to law and not sustained

by sufficient evidence. On appeal however, appellant argues only that the trial court erred in refusing to give his tendered instruction No. 147 relating to the test to be used in determining insanity, and that the verdict was contrary to law and not sustained by sufficient evidence. It is well settled law that grounds urged in a motion for new trial, not discussed in the argument section of the brief are deemed waived. Supreme Court Rule 2-17. *Brown v. State* (1969), 252 Ind. 161, 247 N. E. 2d 76. *Short v. State* (1968), 250 Ind. 459, 237 N. E. 2d 258. *Waggoner v. State* (1949), 227 Ind. 269, 85 N. E. 2d 642.

A brief recital of the evidence most favorable to appellee is as follows: appellant and his wife (hereinafter referred to as decedent), after a short and "unhappy" marriage were divorced. However in October, 1966, they were reconciled and remarried. It appears at this time that the appellant was working two jobs in order to support his family as well as his mother and her children. Within a few weeks after their remarriage, the appellant and decedent once again began having marital problems which culminated in the events of December 18 and 19, 1966.

On December 18, while visiting his mother at her home, appellant got into a fight allegedly started by the decedent in which she introduced a knife. Sometime during the ensuing struggle the decedent was stabbed, although apparently not seriously. Immediately thereafter, appellant left the house whereupon his mother was told by the decedent that she would have to move out.

According to the appellant, on the following day, having learned from his mother that she had been put out of her house, he returned to his mother's residence to discuss with the decedent the possibility of his mother moving back into her home. Appellant and decedent began arguing again at which time his mother-in-law, who was also at the house, threatened to call the police if he didn't leave. At this point

appellant claims to have blacked out. Later he arrived at the home of his friend, Boyd Hall, and made a statement to the effect that he had just "killed Bertha Lee and Mrs. Garret" and handed a gun to Hall. Upon the recommendation of Hall, appellant turned himself into the police, who upon investigation found the bodies of the appellant's wife and mother-in-law.

Appellant's tendered instruction No. 147 embodies the *Durham* test of insanity adopted in *Durham v. U. S.,* (D.C. Cir. 1954) 214 F. 2d 862 namely that the defendant is not criminally responsible if his unlawful act was the product of a mental disease or defect. The trial court, upon refusing appellant's instruction on insanity, proceeded to instruct the jury as to the law in Indiana which recognizes both the *M'Naghten* and *irresistible impulse* tests. The court's instruction No. 44 reads in pertinent part as follows:

". . . under the law of this State an accused person must be found not guilty of the offense with which he is charged, if at the time of committing the act the person accused was laboring under such a defect of reason from a diseased mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know that what he was doing was wrong.

Furthermore, you are instructed that under the law of this State a person may have sufficient mental capacity to know right from wrong and to be able to comprehend the nature and consequences of the act, and yet not be criminally responsible for his actions; for an irresistable impulse of a person accused is a lawful excuse for the commission of an act, otherwise a crime, where the person committing it, though he is capable of knowing right from wrong, lacks in consequence of a diseased state of mind, the will power to resist an impulse to commit crime."

Such an instruction is well documented in Indiana case law. *Hashfield v. State* (1965), 247 Ind. 95, 210 N. E. 2d 429. *Warren v. State* (1963), 243 Ind. 508, 188 N. E. 2d 108. *Whitaker v. State* (1960), 240 Ind. 676, 168 N. E. 2d 212. *Flowers v. State* (1957), 236

Ind. 151, 139 N. E. 2d 185. *Plake v. State* (1890), 121 Ind. 433, 23 N. E. 273. *Goodwin v. State* (1884), 96 Ind. 550. *Stevens v. State* (1869), 31 Ind. 485. *Bradley v. State* (1869), 31 Ind. 492. This court is fully aware of the substantive criticism leveled at the *M'Naghten* and *irresistible impulse* tests.[1] Although we are unable to agree with all such criticism, we are prepared to recognize that these tests, in light of current advances made in the field of psychiatry, have some inherent shortcomings. The *M'Naghten* test places emphasis on the defendant's cognitive faculty, in that the sole question is whether the defendant knew the nature and quality of his act, and if so, did he know that such act was wrong. Such an inquiry inhibits the type of testimony sought from experts in the field of psychiatry by restricting the nature of testimony to the defendant's ability to differentiate between right and wrong. As a result, testimony is usually lacking in regard to the actor's composite personality or complete mental state at the time of the act.

> "The true vice of M'Naghten is not, therefore, that psychiatrists will feel constricted in artificially structuring their testimony but rather that the ultimate deciders— the judge or the jury—will be deprived of information vital to their final judgment." *U.S. v. Freeman*, (2d Cir. 1966), 357 F. 2d 606, 620.

Exclusion of such evidence ignores the tremendous advances made in psychiatric knowledge already alluded to and compels the jury to test guilt or innocence by a standard which unduly stresses the cognitive aspect of criminal intent. Further, the

---

1. The material on this subject is inexhaustible. See as example: *United States v. Freeman* (2d Cir. 1966) 357 F. 2d 606. *United States v. Currens* (3rd Cir. 1961), 290 F. 2d 751. *Durham v. United States* (D.C. Cir. 1954), 214 F. 2d 862. Diamond, *Criminal Responsibility of the Mentally Ill*, 14 Stan. L. Rev. 59 (1961). Sobeloff, *Insanity and the Criminal Law: from M'Naghten to Durham, and Beyond*, 41 ABAJ 793 (1955). Allen, *The Borderland of Criminal Justice* (1964). *Report of the Royal Commission on Capital Punishment* (1953).

various degrees of incapacity are not recognized by such a test. The jury is made to decide either that the defendant could tell right from wrong or he could not. No other choice is given. As noted in the comments to the American Law Institute's Model Penal Code:

> "The law must recognize that when there is no black and white it must content itself with different shades of gray." American Law Institute, Model Penal Code (Tentative Drafts, Nos. 1, 2, 3, and 4) 158 (1956).

This is not to say that the right-wrong test of *M'Naghten* should be completely abandoned.[2] An appreciation for the wrongfulness of an act is essential to the formation of a *criminal* intent. It is our position however, that the defendant's knowledge of the wrongfulness of his act should be considered by the jury in its proper perspective, along with other evidence of the defendant's state of mind.

Many states, like Indiana, have modified the *M'Naghten* test to include the *irresistible impulse* test, the general consensus of opinion among psychiatrists being, as noted by Dean Keedy, that there are cases where a person, suffering from a mental derangement, knows that it is wrong to inflict bodily harm upon another person, but owing to a mental derangement is incapable of controlling the impulse to commit such an act. Keedy, *Irresistible Impulse as a Defense in the Criminal Law*, 100 U. Pa. L. Rev. 956 (1952). The *irresistible impulse* test alone places emphasis upon the volition or will power element as a determinative of human behavior. The very term implies that the impulse

2. For an historical sketch of the origins of the right-wrong test, traced from early Hebrew law see Platt and Diamond, *The Origins of the "Right and Wrong" Test of the Criminal Responsibility and Its Subsequent Development in the United States: An Historical Survey*, 54 Calif. L. Rev. 1227 (1966).

must be sudden and overwhelming and as now applied does not include those cases involving reflection or brooding. Here again, as with *M'Naghten,* a total incapacity of the power to control one's will would seem to be required. The jury is permitted to study only one factor contributing to human behavior and a full investigation of the defendant's mental state of mind is rarely, if ever accomplished.

When both tests are applied in a single definition of legal insanity, consideration can then be given to the elements of cognition *and* volition as they relate to human behavior. However, many of the same objections are voiced when the tests are applied together as when applied individually. For example, expert testimony is still restricted to partial aspects of the defendant's mental state. There is no recognition of a mental disorder resulting from reflection and brooding; it also appears that the combination test would still require complete mental incapacity before criminal responsibility can be relieved.

Another undesirable aspect of the tests as now applied is the requirement that the defendant be suffering from a *mental disease.* Once again the expert is hamstrung by the preconceived notions of both judge and jury as to exactly at what is encompassed by the term disease. In fact, psychiatrists themselves appear to be in general disagreement as to the exact nature of a mental disease. See e.g. Fingarette, *The Concept of Mental Disease in Criminal Law Insanity Tests,* 33 U. of Chi. L. Rev. 229 (1966) and authorities there cited. What is clear is that the term *disease,* as commonly understood, does not cover all mental conditions which should be considered when determining criminal responsibility. It would seem desirable to expand any definition of legal insanity to also include a mental defect. The terms mental disease and defect are appropriately distinguished in *Durham v. U. S. , supra,* p. 875 in that a disease is a condition capable of either improving or deteriorating.

A defect, however is "a condition which is not considered capable of either improving or deteriorating and which may be either congenital or the result of injury or the residual effect of a physical or mental disease." Exactly how these terms, as presently distinguished, are to be defined will be discussed at a later point in this opinion.

Having expressed our concern with the apparent inadequacies of our present rules on insanity as a criminal defense, we next turn to a consideration of the *Durham* rule urged by the appellant. The facts in this case unquestionably lend themselves to the argument advanced by the appellant's brief, for it is appellant's theory basically "that where it can be shown that the 'crime' would not have taken place but for the very low intelligence of the accused *and* where the quantifiable intelligence of the individual is so low as to be cognizable as a defect by the medical profession, the *Durham* rule should be applied."

The facts when viewed most favorably to the State relative to appellant's plea of insanity are as follows: appellant never had the benefit of a happy home life as a child. Born in Arkansas to a sixteen year old mother, he was from birth to about age nineteen forced to live with his grandmother because his mother's husband said that the defendant was not his child. At the age of nine or ten he began working on a farm during the farming season from sunrise to sunset for two dollars a day. It was also about this age that appellant sustained a head injury while playing baseball, after which, and up until the time of the alleged offense, he complained of severe headaches. Apparently appellant attended school outside the farming season, although not with much success, until about the age of eighteen or nineteen at which time he was in the ninth grade. At the age of nineteen appellant moved to Leesville, Pennsylvania, where he lived with an aunt for about two years. While in Leesville, he worked in an "iron factory" pouring iron. After the two years in Leesville, appellant moved to Muncie, Indiana, where he lived at

first with his cousin. Within months after his arrival appellant met the decedent "on the street" and they were married one year later. As already noted, the marriage was an "unhappy" one, as appellant's wife would not take care of the house, care for the children, or prepare meals. Also she "ran around". They were divorced but later remarried just prior to the shooting as reported above.

From the testimony of one clinical psychologist and three practicing psychiatrists it appears that appellant's intelligence quotient was 75 or bordering on retardation. There was no testimony whatsoever that the appellant was suffering from a mental disease and the results of an electroencephalogram showed no irregularity. The various tests given appellant failed to reveal any brain damage resulting from the head injury he had sustained as a child despite his frequent headaches. There was ample testimony that the defendant knew right from wrong, as attested to by the psychiatrists as well as the defendant himself in statements made to policemen immediately after the shooting to the effect that he had done "something bad". The psychiatrists were generally agreed that the shooting of his wife and mother-in-law resulted from an uncontrollable or irresistible impulse caused by anger and fear of rejection.

Here is a man of admittedly low intelligence, who has known much unhappiness and rejection throughout his life. It was agreed by expert testimony that in spite of all his hardship he was a warm individual, capable of giving love and craving affection for himself. He had worked hard since the age of nine or ten and at the time of the shooting was working two jobs to support his own family and help his mother. There is no indication in the record that he had ever run afoul of the law prior to December 19, 1966. The jury might have reasonably inferred from the evidence that he had finally reached his breaking point. Was it the strain of two jobs? Was it a nagging and irresponsible wife? Was it the added burden of caring for his mother and her children? Was it

the occurrence of yet another rejection when his wife insisted that he leave the house? Or, as appellant argues, was it a combination of all these factors, which when directed at an individual of concededly low mentality, resulted in the killing?

As appellee points out and appellant concedes, mental weakness has long been rejected as a defense to a criminal prosecution. *Robinson v. State* (1887), 113 Ind. 510, 16 N. E. 184. *Wartena v. State* (1886), 105 Ind. 445, 5 N. E. 20. However, we are ready to concede that one's intelligence is certainly a factor to be considered when determining whether the defendant had the requisite capacity to conform his actions to the requirements of the law. However, it appears that any such deficiency would have to be severe to qualify. Here, the defendant's I.Q. was 75 or bordering on retardation. Yet he successfully competed in the world about him as evidenced by the fact that he was holding down two jobs which paid a total of roughly $160-180 per week. Dr. Grieber, a practicing psychiatrist, testifying on this point was asked:

> Q "In your opinion doctor could this defendant Lee Willie Hill due to as you stated borderline intelligence and other factors could he ever form a criminal intent or premeditation to do a criminal act? Is he capable?
>
> A Yes I think that he is."

Even having conceded that a mental deficiency should be a factor when determining criminal responsibility, it would seem to this court that appellant would fail under the *Durham* rule here uged, were we inclined to endorse it, since it was not adequately shown nor is authority given for the legal proposition that an I.Q. of 75 is a mental defect of such a nature as to excuse criminal responsibility. In fact, the very court that fashioned the *Durham* rule, at a later date expressly rejected an *I.Q. of 68* as evidence of a mental defect sufficient to negate criminal responsibility where such low I.Q. was the only evidence offered of a mental disease or

defect. *McDonald v. U. S.,* (D. C. Cir. 1962) 312 F. 2d 847. In addition to this fatal deficiency in appellant's argument, he failed to offer evidence which clearly supports a causal relation between the low I.Q. and the murder, as required by the *Durham* test.

Although appellant failed to make a case under the *Durham* rule we would like once again to point out what we feel to be the inherent inadequacies of that rule. This court, in *Flowers v. State, supra,* rejected the *Durham* rule on the grounds that:

> ". . . an accused could know the nature and quality of his act, know that it was wrong, have the will power to restrain his act, and yet by reason of his mental disease, develop egocentric or sadistic tendencies which could produce homicide with criminal impunity". *Flowers v. State, supra,* at 194.

Such a statement evidences a reluctance to completely abandon the *M'Naghten* and *irresistible impulse* tests and we agree with such reluctance. The essence of the *Durham* rule is the causal relationship between the act and the mental disease or defect. Said test disregards what we consider to be well founded tenets of criminal responsibility:

> "To be responsible means (1) to be able to recognize and discharge various duties and (2) to be morally censurable for the voluntary breach of those duties and legally liable if their violation is forbidden by law." Hall, *Responsibility and Law: In Defense of the McNaghten Rules,* 42 ABAJ 917, 984 (1956).

Such a concept of responsibility embraces more than is required by *Durham* i.e. a mere causal relation between the act and a mental disease or defect. It requires both the recognition that a duty exists and the competence to understand that a voluntary breach of these simple moral duties are enjoined by law, and will result in punishment. Thus the criminal law is an expression of the com-

munity's conscience or moral sense. It is important therefore to remember that when considering a defense to criminal responsibility, the mere proof that a certain mental condition existed at the time of the act, or that there is some causal connection between the mental state of the defendant and the act is not enough. Rather there must be a showing that defendant's mind was so affected, he failed to recognize and appreciate his duty to society of complying with its code of acceptable behavior or that, appreciating such fact, lacked capacity to conform his conduct to such requirements.

With this understanding of criminal responsibility we feel duty bound to reject the *Durham* rule in favor of one that recognizes both cognition and volition as elements of such responsibility.

Appellant's argument, in our view, is better adapted to the American Law Institute definition of insanity. In fact, he discusses said test to some extent in his reply brief as related to the appellant's alleged mental deficiency. The additional authorities submitted are concerned entirely with the acceptance of the ALI test in the various jurisdictions either by statute or case law.[3]

3. Several jurisdictions, by judicial decision, have adopted in whole or in part the ALI definition. The following cases indicate the stance taken in the federal courts; the ALI definition was adopted in: *United States v. Freeman*, (2nd Cir. 1966), 357 F. 2d 606. *United States v. Chandler* (4th Cir. 1968) 393 F. 2d 920. *Blake v. United States* (5th Cir. 1969) 407 F. 2d 908. *United States v. Smith* (6th Cir. 1968) 404 F. 2d 720 (refusing however to adopt the second paragraph of the test). *United States v. Shapiro* (7th Cir. 1967) 383 F. 2d 680. *Wion v. United States* (10th Cir. 1963) 325 F. 2d 420. The District of Columbia Circuit in *McDonald v. United States* (D.C. Cir. 1962) 312 F. 2d 847 modifying *Durham v. United States* (D.C. Cir. 1954) 214 F. 2d 862 has adopted a substantiality test although not in the terms of the ALI definition. A similar result was obtained in the Third Circuit in *United States v. Currens* (3rd Cir. 1961) 290 F. 2d 751. Both the First and Ninth Circuits appear open minded on the subject. *Amador Beltran v. United States* (1st Cir. 1962) 302 F. 2d 48. *Ramer v. United States* (9th Cir. 1968) 390 F. 2d 564. Four states have also adopted the test by the decisions of their courts: *Commonwealth v. McHoul* (Mass. 1967), 226 N.E. 2d 556. *Terry v. Commonwealth* (Ky. 1963), 371 S.W. 2d 862. *State v. Shoffner* (Wis. 1966), 143 N.W. 2d 458 (this decision gives a Wisconsin defendant a choice between *M'Naghten* and the ALI test, but

Without a comprehensive review of the many cases and articles on the subject, most of which appear to have been written by those who occasionally enjoy a semantic fencing match, let it suffice to say that we are favorably impressed with the American Law Institute's alternative definition of insanity as adopted by *Freeman, supra,* and followed by the Court of Appeals for the Seventh Circuit in *U, S. v. Shapiro,* (7th Cir. 1967), 383 F. 2d 680 which is as follows:

> "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to *appreciate* the wrongfulness of his conduct or to conform his conduct to the requirements of law. (2) As used in this Article, the terms 'mental disease or defect' do *not* include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (our emphasis). American Law Institute, Model Penal Code (final draft) (1962).

The alternative definition differs only in the use of 'wrongfulness' instead of 'criminality'. As noted in the *Freeman* case, *supra,* p. 622, the definition as then worded would include cases where the defendant appreciated the fact that his conduct was criminal but because of a delusion, believed it to be morally justified.

At the outset, we point to the language of the second paragraph of the ALI test set out above, which indicates that a repetitive pattern of criminality or anti-social conduct, in and of itself, could not be raised under a plea of insanity.

---

should he choose the ALI test he must bear the burden of proof.) *State v. White* (Idaho 1969), 456 P. 2d 797. Finally, several states have adopted (with modifications in three instances) the ALI definition by statute; Ill. Ann. Stat., ch. 38, § 6-2 (1961). Md. Ann. Code, Art. 59, § 9(a) (1968). Laws of Montana 1967, ch. 196, § 95-501. Mo. Stat. Ann. ch. 552, § 552-030 (omits "substantial capacity" qualification). N.Y. Penal C., ch. 40, § 30.05 (McKinney's Consol. Laws, ch. 40, 1967) ("lacks substantial capacity to know or appreciate either: (a) The nature and consequence of such conduct; or (b) That such conduct was wrong"). Vt. Stat. Ann. tit. 13, ch. 157, § 4801 (1959) (substitutes "adequate capacity" for "substantial capacity").

This provision clearly deals with the problem this court recognized in *Flowers, supra,* as an inherent flaw in the *Durham* rule already mentioned.

The test, which recognizes cognitive and volitional capacity, would change present Indiana law in that a mental *defect* is therein clearly established as being a condition which will, *where proper,* relieve a defendant of criminal responsibility. A complete incapacity of the defendant's mental faculties need not be proved, but rather the ultimate question of fact is whether the defendant lacked substantial capacity to conform. Crimes resulting from brooding and reflection as well as "impulse" could then negate responsibility. Finally and most importantly, the test would allow for a complete consideration of the defendant's mental state.

It is this consideration which brings up the issue as to exactly what mental conditions constitute a mental disease or defect envisioned by such a legal test of insanity. Extreme care must be taken at this point to guarantee that the psychiatrists do not usurp the function of the jury. The jury should never be bound by the definitions or conclusions of the experts as to what is a disease or defect. We agree with the court in *McDonald v. U. S., supra,* at 851, where it analyzed this aspect of the problem as follows:

> "Our purpose now is to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. What psychiatrists may consider a 'mental disease or defect' for *clinical purposes,* where their concern is treatment, may or may not be the same as mental disease or defect for the jury's *purpose in determining criminal responsibility.* Consequently, for that purpose the jury should be told that a mental disease or defect includes any abnormal condition of the mind which *substantially* affects mental or emotional processes and *substantially* impairs behavior controls. Thus the jury would consider testimony concerning the development, adaptation and functioning of these processes and controls.

· We emphasize that, since the question of whether the defendant has a disease or defect is ultimately for the triers of fact, obviously its resolution cannot be controlled by expert opinion. The jury must determine for itself, from all the testimony, lay and expert, whether the nature and degree of the disability are sufficient to establish a mental disease or defect as we have now defined those terms. What we have said, however, should in no way be construed to limit the latitude of expert testimony." (our emphasis)

The jury's function in this respect cannot be over-emphasized. Hopefully by this firm pronouncement as to the jury's duty, as it relates to the defendant's mental state of mind, jurors may, in the future, be spared the travail of those lengthy semantic charades so often characteristic of psychiatric testimony. The psychiatrist will best serve the ends of justice if he concerns himself simply with a *description* of the defendant's mental state as he sees it. The jury then will be equipped to make its determination as to his criminal responsibility, supplied with a clear understanding of the nature of the defendant's composite mental state and its relation to the criminal act. They need not be influenced by the use of specific labels, but rather must determine for themselves, whether the defendant's disability was such as to excuse him from criminal responsibility.

It appears that a rule on criminal insanity, expansible and flexible in concept, is necessary and should be advocated. The ALI rule is such a rule and is an attempt to provide a framework under which the jury will be afforded a complete picture of the defendant's state of mind. It creates a formula for fact finding which takes cognizance of modern medical research in the imprecise area of mental diseases and defects. We would agree with the Massachusetts court in *Commonwealth v. McHoul* (1967), 352 Mass. 544, 226 N. E. 2d 556, that the ALI rule *is not substantively a new rule but,* by its recognition of both the cognitive and volitional elements, is *rather an evolutionary restatement of existing law.* The jury, as the trier of facts, remains the sole sentinel in the

protection of both the rights of the accused and the welfare of society, enabled finally to consider all relevant facts pertaining to the defendant's mental state at the time the act was committed, and being thereby better qualified to render its ultimate moral judgment under the law.

> ". . . At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. *But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts.* In so deciding, it cannot be presumed that juries will check their common sense at the courtroom door." (our emphasis) *U.S. v. Freeman, supra,* p. 619-20.

We are of the opinion therefore that the modified ALI rule, *Freeman, supra,* is the rule that would better aid the courts of Indiana in arriving at truth and justice when considering defense pleas of insanity.

Here however, appellant made no objection to the court's instructions on the *M'Naghten* and *irresistible impulse* rules and merely objected to the trial court's refusal to give his tendered instruction on the *Durham* rule. Supreme Court Rule 1-7(2) in pertinent part reads:

> ". . . After the court has indicated the instructions to be given, each party shall have a reasonable opportunity to examine such instructions and to state his specific objections to each, out of the presence of the jury and before argument, or specific written objections to each instruction may be submitted to the court before argument. No error with respect to the giving of instructions shall be available as a cause for new trial or on appeal, except upon the *specific* objections made as above required." (our emphasis)

See also *Callahan v. State* (1964), 246 Ind. 65, 201 N. E. 2d 338. Having already made our position clear on the *Durham* rule, we hold that by reason of the evidence presented and all reasonable inferences to be adduced therefrom, the state has sustained its burden of proof on the issue *as raised* by appellant's plea of insanity. Therefore, appellant's contention that the verdict is contrary to law as it relates to appellant's insanity is without merit.

The case law in Indiana embracing as it does the *M'Naghten* and *irresistible impulse* rules has evolved as a result of the common law application of erstwhile accepted psychiatric concepts and are therefore subject to reevaluation and change from time to time by this court as deemed necessary to contemporize the rule with current psychiatric knowledge. Although we can not properly apply the ALI rule in this case, for to do so would overrule the well established and long standing procedure for preserving questions relating to instructions, we do however believe it to be incumbent upon this court, at this time, to point out the superior nature of the ALI rule.

Appellant next contends that the verdict is not sustained by sufficient evidence and is therefore contrary to law. Appellant has been convicted of second degree murder which is defined in Ind. Ann. Stat. § 10-3404 (1956 Repl.) as follows:

"Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and, on conviction, shall be imprisoned in the state prison during life."

Appellant argues that there was no showing of malice to support such a conviction. However it is well established that the use of a deadly weapon in circumstances where it is likely to cause death is sufficient to raise an inference of malice which will sustain a charge of second degree murder. *Brown v. State, supra; Maxey v. State*

(1969), 251 Ind. 645, 244 N. E. 2d 650; *Warren v. State, supra; Martin v. State* (1957), 236 Ind. 504, 141 N. E. 2d 455; *Murphy v. State* (1869), 31 Ind. 511.

For all the foregoing reasons, the judgment of the trial court should be affirmed.

Judgment affirmed.

DeBruler, C. J., Arterburn and Givan, JJ., concur; Jackson, J., concurs in result.

NOTE.—Reported in 251 N. E. 2d 429.