LYNN *v.* STATE OF INDIANA.

[No. 369S63.  Filed February 3, 1971.  No petition for rehearing filed.]

*R. D. Reading,* of Wabash, for appellant.

*Theodore L. Sendak,* Attorney General, *William F. Thompson,* Deputy Attorney General, for appellee.

ARTERBURN, C.J.—The appellant was indicted for murder in the first degree and found guilty as charged and given life imprisonment.

The homicide was the result of a controversy between the defendant and his estranged wife, Sandy. The evidence discloses that while Sandy was away from home with a female friend with whom she lived at the time, the defendant drove up in his automobile, compelled her to leave the car, and dragged her back to his car. He beat her with the butt of a revolver, threatened her companion and another person that he would kill them if they interfered, and then shot her in the head two or three times. Thereafter he drove away.

The first contention made by the appellant is that the court erred in giving Instruction Number 4 over the objection of appellant. Although appellant claims that the instruction misstated the elements necessary to prove insanity, the objection of the appellant to that instruction was more narrow, namely, that insanity "does not require a destruction of the will power but merely a temporary cessation of the operation of the same." We thus are limited by the objection as to whether or not the instruction was valid on the ground that it did not cover temporary insanity. This is the gist of appellant's argument. This issue may be easily disposed of without elaborate consideration for the reason that the court did give other instructions which in our opinion recognized and adequately covered the question of temporary insanity, to which the appellant made no objections at the time. There were two of these instructions given by the court, namely, number 8 and 12, which extensively covered the matter of temporary insanity.

The appellant makes some contention about the use of the words "completely destroyed" with reference to a person's will power, but no objection was made on that specific ground. *New York, Chi., etc. R. R. Co.* v. *Henderson* (1957), 237 Ind. 456, 146 N. E. 2d 531.

Instructing a jury is most difficult and complex. Criticisms most often consist of super-refinements which have no substantial effect upon the ordinary and common meaning to be drawn from the instructions. Words at the best are imperfect means of precise communication. Their meaning will vary with the time, place or environment under which they are uttered. Far too often we, as courts, are prone to give over-emphasis to some slight shaded meaning in an instruction which we, as men, know could not have affected the jury in its deliberations. Courts have been criticized for such over-refinement in meaning. *Noel* v. *State* (1966), 247 Ind. 426, 215 N. E. 2d 539; *Woods* v. *State* (1957), 236 Ind. 423, 140 N. E. 2d 752.

We do not believe where a lawyer fails to perceive the claimed error, that the average layman or juryman could have been misled by the instruction. The purpose of an objection in the trial court is to give the trial court an opportunity, when attention is called to an alleged error, to make a correction. That could have been done in this case if it was of such importance that the attorney felt the court should make the correction. It has been said many times by this Court that an appellant must make a specific objection in the trial court, thus giving the trial court an opportunity to make a correction at the time, rather than failing to be specific and raise it for the first time on appeal. We find no error in the giving of Instruction Number 4 as presented to us.

Appellant next contends that the court erred in permitting the prosecution on redirect examination to go beyond evidence opened up by the defense on cross-examination. This occurred when a psychiatrist, Dr. H. Matheu, was asked on cross-examination if he was aware of the fact that the defendant had on at least one or two occasions been involved in an accident resulting in a head injury. The answer was:

"A. Yes, Mr. Lynn told me at the time I was interviewing him. He told me that at one time he had an accident which resulted in a fracture but in my attempt to try to find more detail about it I was not able to because Mr. Lynn does not remember the hospital where he was taken care of, nor did he remember the doctor who took care of him."

On re-direct examination the prosecutor asked the following question:

"Q. Doctor, were you aware of the fact that Mr. Lynn here has on at least one and I think possibly two occasions been involved in accidents which resulted in head injury or possibly concussion?

A. Yes, Mr. Lynn told me at the time I was interviewing him. He told me that at one time he had an accident which resulted in a fracture but in my attempt to try to find more detail about it I was not able to because

> Mr. Lynn does not remember the hospital where he was taken care of, nor did he remember the doctor who took care of him."

Thereupon, the prosecuting attorney, because the Doctor, on cross-examination and now on re-direct examination, said he did not remember the hospital, asked the Doctor the following question:

> "Q. Dr. Matheu, did the defendant during this interview you went into with Mr. Morris ever state that he had been at Logansport before?
>
> A. I don't recall now, but there was some talk that he was at Logansport, and he was there but not as a patient.
>
> Q. What was he there as?"

Thereupon the defendant's attorney made the following objection:

> "Judge, I believe the prosecutor could have asked this on direct examination. We brought out nothing new on cross-examination and therefore, I am going to object to any further questioning of this witness."

The court overruled the objection and then the Doctor made the following answer:

> "A. Yes. Well, one of the privileges in the hospital is we have people from the State Farm, who *is* assigned to the Logansport State Hospital to work and help in the maintenance, in cleaning and what have you, and there is generally an average number of between fifteen and seventeen people from the State Farm who are assigned there to help us and I believe Mr. Lynn was a member of this group while he was in Logansport State Hospital and was not a patient."

It seems to us that the prosecuting attorney had a right to find out from the Doctor on re-direct examination why the defendant was at Logansport Hospital, if it was not for treatment. Regardless of this question, however, it occurs to the Court that all of this testimony is pertinent and relevant with reference to the insanity issue which was raised by the appellant (defendant below) in this case. It

is a well settled rule of law that once a defendant pleads insanity he opens the door to all the facts of his life that are relevant to that issue.

Ewbanks Indiana Criminal Law, Symmes Edition, § 254, p. 149 states that when the issue of insanity is raised by the court in a criminal case:

> "The state may introduce evidence showing the commission of another crime by defendant where it tends to overcome the plea of insanity interposed by him. All relevant acts and conduct of the accused during his life are admissible. The jury are the exclusive judges of the credibility of the witnesses, and the weight of the evidence and what it proves;..."

This passage is supported by ample authority. Therefore the fact that incidentally it was shown here in examining and cross-examining a witness who testified as to the sanity of the appellant that he had been in the State Farm at some time, appears to us to be under the general rule, and not to be error. *Baker* v. *State* (1921), 190 Ind. 385, 129 N. E. 468; *Kallas* v. *State* (1949), 227 Ind. 103, 83 N. E. 2d 769.

The appellant next contends that the court erred in admitting into evidence conversations between the police officer and the appellant without the appellant being adequately apprised of his constitutional right to remain silent and have the assistance of an attorney, and that a printed card used by the police, stating his constitutional rights, was a duplicate of the one read and given to the appellant and therefore improperly introduced in evidence. The facts with reference to this matter, upon which the court made its determination as to the admissibility of this evidence, began with the arresting officer's testimony:

"A. At that point, I told him that I never had mistreated him, that he would be treated the same as he treated me.

Q. And what was the next step taken by you?

A. He was placed in the police car and we started for jail.

Q. And what did you do on the way to the jail?

A. Enroute to the jail I handed the defendant a constitutional rights card which is preprinted.

Q. And you say you read this card to him as you were driving and advised him of his rights as shown here?

A. He was given a card similar to this—*identical to this.* I explained what each of those were to the best of my ability while driving the car and asked him if he understood those? (Emphasis added).

Q. His answer?

A. His answer was that *he did understand them.* He also asked if he had to have an attorney. (Emphasis added).

Q. What did you state to that question?

A. I answered him, right at that time he didn't have to have an attorney, however, he probably would be required to have one when he went to court.
At this point the "Warning of Rights card is admitted into evidence as *State's Exhibit Y.*

Q. I believe we were at the point where you read him his rights and gave him a copy of this card and his rights explained to him on the way to the jail?

A. Yes, sir.

Q. Was there any more conversation between you and the defendant on the way to the jail?

A. None that I recall.

Q. Mr. Draper, what did you do upon arriving at the jail?

A. On our arrival at the jail, in the outer office, the defendant was booked into the county jail. At that time, I advised him it was my duty to try to obtain a statement that led up to the commission of the crime and the part that he played in it.

Q. Who was present when you advised him of this?

A. The defendant and myself and Officer Hapner.

Q. And what was his answer to this statement of yours?

A. He replied to me that he knew he had done wrong, that he had been caught and that he wished to make a statement.

Q. Was he advised of his rights again?

A. At that time he was read another form of his constitutional rights along with a waiver, which was read while he read along, and signed by him.

Q. I would like to hand you what has been marked State's Exhibit Z-1 and Z-2. I wonder if you can identify these?

A. This is a form used at the Wabash County Jail to advise a person of their rights and also a waiver of those rights.

Q. Is Z-2 a copy?

A. Z-2 is simply a duplicate of the original.

Q. And this Exhibit Z-1 and Z-2, you did read his rights to him from that form?

A. Yes, sir.

Q. And whose signature is that appearing at the bottom of the waiver?

A. This is the defendant's signature.

Q. And was it *signed in your presence?*

A. Yes, it was, by Officer Hapner and myself."

Regarding the statements of the appellant, we should keep in mind that *Miranda* v. *Arizona* (1966), 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, does not prohibit or prevent a defendant from waiving counsel and making a statement, after adequate warning. It only requires that his request to remain silent or his request for counsel be respected and that he not be interrogated. If a defendant decides he does not want an attorney at that time and desires to talk, after being adequately warned, he has the right and privilege, and we feel that situation existed in this case.

The trial court had to make a finding upon the admissibility of this evidence and whether or not the appellant had waived his rights. We think there is substantial evidence to support the trial court's finding in this respect and to permit the admissibility of the evidence objected to.

The final argument is made that the court should have directed a verdict of acquittal because only one of the four psychiatrists who gave testimony on the question of sanity was willing to state the appellant was legally sane, and that

the other such witnesses would not say that in their opinion he was sane "beyond a reasonable doubt." Of course, the general rule is that a conviction will be sustained if there is any substantial evidence to support the verdict of the jury.

We have held that even though psychiatrists and expert witnesses on the question of insanity may all testify that in their opinion a person was insane at the time of the alleged act, still, if there are facts and nonexpert testimony based upon facts to the contrary, the jury may accept such facts and reject those of the psychiatrists. *Johnson* v. *State* (1969), 252 Ind. 79, 264 N. E. 2d 57; *Hill* v. *State* (1969), 252 Ind. 601, 251 N. E. 2d 429.

The judgment of the trial court is affirmed.

Givan, DeBruler and Hunter, JJ., concur. Prentice, J., not participating.

NOTE.—Reported in 266 N. E. 2d 8.