PERRY MCFARLAND *v.* STATE OF INDIANA.

[No. 1174S232. Filed November 13, 1975.]

*John F. David,* of Evansville, for appellant.

*Theodore L. Sendak,* Attorney General, *Arthur Thaddeus Perry,* Deputy Attorney General, for appellee.

ARTERBURN, J.—The appellant, Perry McFarland, stands convicted of the first degree murder of one Rachelle Gaines. Testimony at trial revealed that the Appellant had been romantically involved with the decedent and that the two of them had at one time lived together. On January 23, 1974, the decedent, with her daughters and some friends, was moving into a new apartment. The Appellant came to this apartment and shot the decedent with a .22 caliber pistol. Apparently upset over his relationship with the decedent, the Appellant had previously made several threats against her life. The Appellant was apprehended by state trooper Billy J. Abel shortly after the shooting.

A grand jury indictment against the Appellant for first degree murder was filed on February 12, 1974. Prior to trial, the Appellant moved for change of venue. This motion was denied. The Appellant also filed a special plea of insanity. Trial by jury was held from June 4 through June 6, 1974. The jury returned its verdict of guilty on June 6 and the Appellant was sentenced to life imprisonment on June 28. The Appellant's Motion to Correct Errors was denied on September 3, 1974. From the overruling of this motion the Appellant now appeals.

## I.

Specification 1 of Appellant's Motion to Correct Errors contends that the trial court erred in overruling the Appellant's verified motion for a change of venue from the county. The Appellant alleged as the basis for this motion pre-trial publicity in the various news media.

The Appellant has not presented this court with a record sufficient to permit review of all the news media. It is the duty of an Appellant to make a proper record. *Buchanan* v. *State*, (1975) 263 Ind. 360, 332 N.E.2d 213. We are accordingly restricted to the Appellant's presentation of newspaper clippings and voir dire examination.

The Appellant relies heavily on *Irvin* v. *Dowd*, (1959) 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, and *Sheppard* v. *Maxwell*, (1966) 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, in presenting his argument here. In those cases the United States Supreme Court felt that the prejudicial publicity rendered the decision at trial unfair because of the atmosphere in which the trial was conducted. It now appears that the United States Supreme Court has softened its attitudes in such matters and not all convictions in criminal cases which receive publicity are to be stricken down. This more recent attitude is presented to us in *Murphy* v. *Florida*, (1975) 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589:

> "The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' *Irvin* v. *Dowd, supra,* 336 U.S., at 722. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' *Id.,* at 723. At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of

such an opinion in the mind of the juror as will raise the presumption of partiality.' " *Ibid.*

The voir dire in this case does not suggest prejudice by jurors who served in Appellant's trial which could not be laid aside. Several jurors indicated that they had heard something about the case through television or newspaper accounts, but none indicated that these recollections would prevent them from weighing only the evidence presented to them at trial. The Appellant challenged none of the jurors for cause. There is in the record not a single instance of a challenge for cause by the Appellant being rejected by the trial court. A trial court's overruling of challenges for cause is harmless error, if error at all, when the defendant does not exhaust his peremptory challenge. *Sutton* v. *State,* (1957) 237 Ind. 305, 145 N.E.2d 425; *Quarles* v. *State,* (1945) 223 Ind. 652, 63 N.E.2d 849. Here, Appellant neither challenged his jurors for cause, nor did he exhaust his peremptory challenges. The Appellant accepted the jury at the close of voir dire and cannot now complain.

Appellant presents this court with twelve newspaper clippings related to the Appellant's indictment and trial. One concerns a requested change of venue by a defendant in another trial on the grounds that his name sounds like that of the Appellant. Other clippings refer to delays in the grand jury proceedings, appointment of counsel, rescheduling of arraignment, and other facts of public record. These articles do not go beyond minimal reportorial coverage and do not approach the news treatment found in the *Irvin* and *Sheppard* cases.

A trial court's denial of a motion for change of venue in a case such as this is reviewed only for abuse of trial court discretion. Ind. R. Crim. P. 12; *Gibbs* v. *State,* (1971) 257 Ind. 187, 273 N.E.2d 280. We can find no such abuse here.

## II.

The Appellant's next allegation of error concerns the admission into evidence of color photographs of the body of the deceased on the floor of the apartment in which she was shot. The Appellant contends that these photographs, State's Exhibits 3 and 4, portray the body of the deceased after it was apparently turned from a position on its side to a position on its back. It is contended that this resultant inaccuracy robs the photographs of probative value sufficient to overcome their inflammatory and prejudicial nature.

The general rule regarding such photographs was set down by this court in *Kiefer* v. *State,* (1958) 239 Ind. 103, 108, 153 N.E.2d 899, 900:

> "Even though these photographs representing Exhibits Nos. 10, 11 and 12 may have been, to some degree, repetitious and cumulative, and are gruesome in character, they serve to elucidate and explain relevant oral testimony given at the trial and they were properly admitted for the purpose of showing fully the scene of the crime, the nature of the wounds of the victim, and the condition of the basement immediately after the crime was committed."

The role of accuracy in the admissibility of photographs was briefly put in *McCurdy* v. *State,* (1975) 263 Ind. 66, 324 N.E.2d 489 at 496:

> "As previously stated by this Court, 'For a photograph to be admissible it is first necessary to establish that it is a true and correct representation of the thing it intends to portray.' *Johnson* v. *State* (1972), 258 Ind. 648, 655-56, 283 N.E.2d 532, 536."

Accuracy, then, relates to that which the photograph intends to portray. The photographs in this case were not intended to portray the precise posture of the victim after the crime. Rather, they were intended to show the general position of the body. Testimony revealed that the photographs were accurate in this respect.. Moreover, the photographs were

accurate in identifying the victim, showing the scene of the crime, and showing the nature of the victim's wounds.

The photographs here were of probative value in elucidating relevant oral testimony. We can find no error in their admission into evidence.

### III.

The Appellant's next allegation of error concerns testimony regarding phone conversations between the Appellant and two prosecution witnesses. The first conversation testified to was between the Appellant and Linda Feist:

> "He asked if Mom was there and I said, 'No.' He said, 'Is she still over at the apartment?' I said, 'Yes.', no, I said, 'I don't know where she is.'
>
>        \*   \*   \*
>
> He said she could stay cooped up in the apartment for as long as she wanted to but whenever she gets out he was gonna get her. He said it didn't matter where or when.
>
>        \*   \*   \*
>
> I said, 'I don't understand why you want to kill her. I don't know what's going on but I just don't understand it.'
>
>        \*   \*   \*
>
> I said, 'I don't understand why you're going to kill her, I don't know what's going on between you two but I just don't understand.' He said, 'Well, I'm just tired of her screwing me over and if I can't have her nobody else can.' He said, 'I'm just gonna kill her.' And he said, 'If I can't get her, I'm gonna get you or Laura and if I can't get you, I'm gonna get your grandmother or I'm gonna get Rex.' I said, 'I just don't understand the whole thing. I don't know why you want to kill her.' He said, 'I'm just tired of her screwing me over.' "

The Second conversation giving rise to objection by the Appellant was between the Appellant and Carol Street:

> "He wanted to know if she was at my house or where she was and told me that she was avoiding him and I told him I knew little about that. And he explained to me that she didn't want to see him and he didn't, he wasn't going to stand for that. First he said he was gonna go away for a

couple of weeks and then he was gonna come back and get her.

\* \* \*

Then he started threatening her. I tried to talk to him and tried to reason with him but there just wasn't any reasoning with him. He was angry at her and he told me she had a boyfriend which she didn't and that her boyfriend was going to be minus one girlfriend. Then he said he was gonna kill her because his life wasn't worth living without her.

\* \* \*

Yes, I told him that you just didn't talk like that. Things like that just don't happen.

\* \* \*

Well, I tried to talk to him and at times I thought he was listening to me but by the end of the conversation I knew he just, he was paying no attention to me. He had his mind made up."

Appellant does not object to testimony relating to what he said in these phone conversations. Rather, he finds error in the admission into evidence of what the witnesses said in those conversations. Particularly cited by Appellant:

"I said, 'I don't understand why you're going to kill her, I don't know what is going on between you two but I just don't understand' . . . 'I just don't understand the whole thing. I don't know why you want to kill her.'

\* \* \*

Yes, I told him that you just didn't talk like that. Things like that just don't happen.

\* \* \*

Well, I tried to talk to him and at times I thought he was listening to me but by the end of the conversation I knew he was just, he was paying no attention to me. He had his mind made up."

The Appellant contends these statements by the witness to the Appellant and conclusions as to the Appellant's state of mind were immaterial, irrelevant and incompetent.

Both these conversations related to issues of intent and premeditation. It is indeed unusual to state that only part of

a conversation, the words of a defendant, are admissible while the words of the interrogator or witness are not. It is a general principle of the law of evidence that conversations between witnesses and the defendant with reference to the commission of the crime charged are relevant and admissible. It is the whole conversation, not merely one side of the conversation, that is admissible. The jury is entitled to know the context in which the statements of the defendant were made. In *Cunningham* v. *State*, (1971) 256 Ind. 135 at 139, 267 N.E.2d 181 at 183, this court stated:

> "A statement of a victim 'You threatened me' and the answer of the defendant 'Yes, I did' would be admissible in a case of the character we have here. This goes to show threats and animosity, which certainly is relevant. To say that only the statement of the defendant, 'Yes I did' would be admissible, has no meaning unless the other side of the conversation in which defendant participated goes into evidence to explain his statement."

The entire conversations of the Appellant with the witnesses were properly admitted.

### IV.

Admitted into evidence at trial was testimony of prosecution witness Linda Feist regarding a brief conversation she had with the Appellant shortly after the crime and the Appellant's capture. Appellant finds error in the following:

"Q  What did you say to him?

A  I ran over and I said, 'Perry, why did you do it?' He said, 'I told you I was goin' to.' I said, 'I know, but I don't understand why you did it.' He said, 'I told you I was gonna do it and I'm not sorry. She deserved it.' Then I just turned around and walked off."

The Appellant contends that the statements of the witness are inadmissible on the same grounds as those raised before regarding the phone conversations between witnesses and the Appellant. The statements of the Appellant, it is contended, are inadmissible because the Appellant has been

taken into police custody and not yet advised of his *Miranda* rights. We find merit in neither argument.

The statements by the Appellant here were not made to law enforcement officers. *Miranda* v. *Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 is simply not applicable to statements made to a private individual. *Trinkle* v. *State*, (1972) 259 Ind. 114, 284 N.E.2d 816. The Appellant's statements were properly admitted into evidence as admissions. As discussed before, the entirety of the exchange between the Appellant and the witness was admissible.

## V.

State's Exhibit No. 10 was a .22 caliber pistol which was allegedly the murder weapon. In laying a foundation for the admission of this exhibit into evidence, the prosecution asked state trooper Billy J. Abel how he could identify the weapon. His response:

"Because the gun had initials and a date on it on the side that was scraped into the side of the revolver. It was from a previous handling of some type. Someone had engraved an initial on it."

The Appellant contends that this constitutes proof of other crimes, especially when considered in conjunction with prejudicial pre-trial publicity and that its admission into evidence is thus reversible error. We cannot agree with this contention.

We have already concluded that it cannot be presumed that that the Appellant was prejudiced by pre-trial publicity. More importantly, we cannot presume that the jury viewed trooper Abel's testimony as proof of other crimes. He simply stated that the weapon had been previously marked. He did not indicate where, when, or by whom this was done. His testimony implies that he did not know. This court cannot presume that the jury drew prejudicial conclusions from this isolated statement.

## VI.

Finally, the Appellant contends that the giving of State's Instruction No. 2 constituted reversible error. That instruction reads as follows:

"You are instructed that under the law of this State a person may have sufficient mental capacity to know right from wrong and to be able to comprehend the nature and consequences of the act, and yet not be criminally responsible for his action; for an irresistible impulse of a person accused is a lawful excuse for the commission of an act, otherwise a crime, where the person committing it, though he is capable of knowing right from wrong, lacks in consequence of a diseased mind, the will power to resist an impulse to commit crime."

It is the Appellant's contention that this instruction should not have been given because it was not the Appellant's defense theory that he had acted out of an irresistible impulse nor was there any evidence introduced at trial to support such a theory. There is no merit in this contention.

The Appellant in this case entered a plea of not guilty by reason of insanity. The test for insanity in this state involves elements of both cognition and volition. *Hill* v. *State*, (1969) 252 Ind. 601, 251 N.E.2d 429. Irresistible impulse is very much a part of the element of volition. As such, an instruction explaining that principle is proper. *See Fuller* v. *State*, (1973) 261 Ind. 376, 304 N.E.2d 305.

The jury here also was given a proper insanity instruction as outlined in *Hill, supra*. The jury thus received a complete and correct explanation of the law regarding insanity. It is difficult to find error in such thoroughness. While the appellant's defense may have stressed the cognitive element of the insanity test, the presentation of evidence regarding insanity inherently raises questions regarding the volitional element. It is as easy to see that the Appellant was aided in his defense by this instruction as it is to see that he was

prejudiced. It is perhaps easier yet to see that the instruction had no effect at all. In any event, we find no error.

The judgment of the trial court is affirmed.

All Justices concur.

NOTE.—Reported at 336 N.E.2d 824.