Jerry W. GARDNER, Sr., Appellant,

v.

STATE of Indiana, Appellee.

No. 280S38.

Supreme Court of Indiana.

April 24, 1981.

Peter L. Benjamin, Merrillville, for appellant.

Linley E. Pearson, Atty. Gen., Wesley T. Wilson, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

Appellant, Jerry Gardner, was convicted in a trial by jury of two counts of first degree murder and one count of assault and battery with intent to kill. He was sentenced to two terms of life imprisonment and one term of not less than two nor more than fourteen years. On appeal he raises the following issues:

1. Whether the evidence that he was sane at the time of the killings was sufficient to convict.

2. Prosecutorial misconduct in final jury summation.

3. Error in overruling an objection to cross-examination of an expert witness.

Appellant was charged and convicted of stabbing and killing his wife, Deidra and his infant son Jerry, Jr., and stabbing and attempting to kill his infant son Monty. He was also charged with stabbing and attempting to kill his blind brother, but was acquitted on that count. At trial appellant relied primarily upon the defense of insanity. The offense was alleged to have occurred on December 14, 1975. The burden fell upon the prosecution at the 1979 trial to prove appellant sane to the satisfaction of the jury beyond a reasonable doubt. *Hill v. State*, (1969) 252 Ind. 601, 251 N.E.2d 429; Ind.Code § 35-41-4-1 (amendment placing burden on defendant to prove insanity effective April 1, 1978). That burden can be met by proof that the accused was not suffering from a mental disease or defect at the time of his conduct comprising the offense or that if so suffering he was nevertheless possessed of a substantial capacity to appreciate the wrongfulness of such conduct and to conform his conduct to the requirements of the law. *Williams v. State*, (1979) Ind., 393 N.E.2d 183; *Hill v. State, supra*. The insufficiency of evidence of the element of sanity is subject to the same rules as are other insufficiency claims. Therefore in determining the question we do not weigh the evidence nor resolve questions of credibility but look to the evidence and reasonable inferences therefrom which support the verdict. *Smith v. State*, (1970)

254 Ind. 401, 260 N.E.2d 558. The conviction will be affirmed if from that viewpoint there is evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Glover v. State*, (1970) 253 Ind. 536, 255 N.E.2d 657.

■ In preface to a recounting of evidence from which the jury could have inferred appellant's sanity, there is a body of strong and persuasive evidence supporting the inference that appellant was suffering from schizophrenia at the time of the offenses and unable to appreciate the wrongfulness of his conduct and totally unable to resist the impulse to kill his family. Three psychiatrists so testified. Appellant's brutal, violent acts against his defenseless wife and two infant children so bespeak. Appellant's confession evidences that appellant was responding at the time of the killings to a voice he heard from a god or spirit commanding him to kill, and that he had been observed on occasion to cry and gesture in an unusual manner without apparent reason, and that he had spoken on several occasions prior to the killing of hearing voices and attributing them to spirits or voodoo.

In spite of this impressive evidence, the jury concluded that appellant was legally sane at the time of the killings, and it is our judicial assignment to examine the evidence supporting that inference and to determine whether it was sufficient.

In December, 1975, appellant was employed at United States Steel as a straightener. He lived with his wife, two infant sons, his blind brother, and his mother and father. On the night of the 14th, in retiring, appellant told his wife that he heard voices again and went to the kitchen and got a butcher knife which he put under his pillow. After she went to sleep he watched television for a while. He began to hear voices and went "berserk" and began swinging the knife and stabbed his wife and two children repeatedly. During this episode he cut or unplugged the wires on three phones in the house. When he was finished, he poured himself a glass of wine and drank it. He went across the street to the house of a policeman, but unable to raise anyone there, went to the hospital and spoke with a nurse and told her of an emergency at his house. He was directed to another place in the hospital, but went to the police station instead and told officers present that he thought that he had killed his wife. Within a short time the bodies were discovered and appellant made a complete confession. When making this confession he said that he was hearing the voices again and his body tensed. He indicated no remorse during this time. Later in the day he was very remorseful and cried and was discovered to have a cut on his left wrist and had to be taken to the hospital.

Appellant's blind brother testified that he had never known appellant to act in a strange or unnatural manner and that he had never heard him speak in a strange manner. Appellant's mother testified that she found him sitting and rocking in a corner crying one day. She also testified that shortly before the tragedy at the house, she was taking appellant to work and he was talking to himself and making strange signs with his hands and said that she should follow the voices which he was then hearing. She told him to stop that, and he did so.

The jury also heard evidence from psychiatrists that there are varying degrees of the disease of schizophrenia and that during remission a person suffering from it would know right from wrong and would have the capacity to conform to the mandate of the law. It also heard that more than a year before the killings appellant had called friends and asked them to come over as he was hearing voices and seeing visions and was afraid that he might kill someone. Prior to that in 1973 appellant had had similar experiences in an episode during which he had taken some "street drugs".

Based upon this evidence the jury was warranted in inferring that appellant had a substantial capacity at the time of the killings to appreciate the wrongfulness of his conduct. He became aware prior to December that his experiences in hearing voices made him dangerous to others. On the

night of the 14th he dismantled the telephones in the house so as to prevent those within from getting help when he attacked them. He went across the street to the home of a police officer neighbor and then to the police station and reported his conduct. These are the actions of one who is aware of the wrongful nature of his conduct.

Based upon the foregoing evidence the jury was warranted also in inferring that appellant, in spite of the diseased state of his mind, nevertheless retained a substantial capacity to resist the compulsion he felt to kill. A stern reprimand by his mother caused him to suppress it. He had held it in abeyance on a previous occasion until he could call for support from friends. When confronted with superior opposing force at the police station interrogation, he did not act in response to it. Appellant's brother with whom he was close found him to be normal and natural in speech and act. Given the evidence, the jury was warranted in concluding that appellant retained the will to reject and suppress the compulsion arising from his illness and conform his conduct to the law. The evidence is therefore sufficient to sustain the conclusion beyond a reasonable doubt that appellant was sane at the time of this tragedy, in the legal sense.

■ The next contentions of appellant are that the trial court erred in refusing to grant a mistrial or admonish the jury because of alleged excesses indulged in by the trial prosecutor during final jury summation. The first such episode occurred when the prosecutor standing close to the jury at the rail said to the jury:

"Another indication of his ability to conform his conduct to the requirement of the law, when he heard the voices in his home that morning and his actions; when he heard the voices that afternoon at the police station. Supposedly he couldn't control his actions, he couldn't conform them to the requirements of the law when he was faced with a woman—his wife—two babies, ladies and gentlemen, three months old and sixteen months old—"

The court overruled an objection to the conduct of the prosecutor on the basis that he had screamed and that it was intimidating and an improper appeal to the emotions and prejudice of the jury and denied a motion for mistrial. The content of this part of the argument was entirely proper as founded in the evidence and related to the governing law. The manner in which it was delivered is not and cannot be accurately communicated via the written word to an appellate court, and consequently the law is content to afford the trial court a broad discretion in controlling the tone and manner of delivery of trial counsel. Based upon the record before us we find that the trial court did not err in overruling the objection and in denying the motion for mistrial.

■ The second such episode occurred when the trial prosecutor read an excerpt from *Hill v. State, supra,* on the issue of insanity, in which this Court had explained that the jury after hearing the medical opinions and other facts in the case is the best organ to make the "legal, social or moral judgment" whether a person with the characteristics appearing in the total evidence would or should not be held accountable for his acts. The prosecutor then said that they should not permit the defendant to fool them as he had fooled the doctors and that, representing society, they should find him legally and morally accountable. He also used such words as slaughter in the course of the final argument.

The prosecutor's use of words such as "slaughter" and "fool" were permissible characterizations of appellant's conduct as revealed in the evidence and their use did not constitute misconduct. The excerpt from the *Hill* case was properly employed. It fairly and pointedly states the position of the jury in relation to the various forms of proof of sanity and insanity, including medical opinion and inferences from physical facts and related circumstances. This jury faced conflicting evidence from these different sources. We are unable to agree that under the circumstances with which the jury was required to deal in this case, the prosecutor's words and the manner of

their delivery would have inflamed the passions and prejudices of the jury against appellant. The final summation of the prosecutor was within reasonable bounds and was properly tolerated by the trial judge. Spirited advocacy is not misconduct. *Ortiz v. State*, (1976) 265 Ind. 549, 356 N.E.2d 1188. The trial court did not therefore err in denying the objection or overruling the motion for mistrial directed to this matter.

■ The final contention in this appeal is that the trial court erred in permitting the trial prosecutor to attempt impeachment of a physician witness by reference to nurse's notes in the patient's hospital report which disclosed that appellant had been observed by Nurse Bronczyk reading a book on witchcraft. The objection to this process was based upon hearsay and the denial of confrontation. The witness expressed his opinion that appellant was not legally sane on the date of the offense and predicated the opinion in part upon his review of appellant's record and medical reports at the Beatty Memorial Hospital to which appellant had been committed for treatment between his arrest and trial. The trial court overruled the objection, but prior to the use by the prosecutor of any specific statements in the records admonished the jury that they were not to consider them as proof of the truth of the matters contained therein, but only to test the credibility of the witness.

Appellant argues that the use of the nurse's note was improper hearsay and violated the confrontation clauses of the United States and Indiana Constitutions, for the reason that the expert witness did not use or rely on the note in arriving at his ultimate opinion. We do not agree on either score. The nursing notes constituted part of the patient's hospital record which the witness stated he examined preparatory to forming his medical opinion. In the course of this examination he segregated nursing notes from the "staffing reports" and used or relied only on the latter. The nursing notes rejected, like the staffing reports credited by the witness have the same po-

tential for creating an impeaching effect and were therefore properly brought to light before the jury by the cross-examiner for its use in determining the weight to be given to the witness' opinion. Such use is proper under an exception or relaxation of the hearsay rule and does not violate the right to confrontation where the jury receives a proper limiting instruction such as was given in this case. *Smith v. State*, (1972) 259 Ind. 187, 285 N.E.2d 275. There was no error when the trial court overruled appellant's trial objection to the use of this matter under these circumstances.

The conviction is affirmed.

GIVAN, C. J., and HUNTER, PRENTICE and PIVARNIK, JJ., concur.