Jimmie Lewis **MANNS**,
Defendant-Appellant,

v.

**STATE of Indiana, Plaintiff-Appellee.**

No. 3–1080A319.

Court of Appeals of Indiana,
Third District.

May 6, 1981.

Rehearing Denied July 9, 1981.

Terry E. Johnston, James V. Tsourtsouris, Valparaiso, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Frederick N. Kopec, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

The appellant, Jimmie Lewis Manns, was convicted of Robbery. He now appeals that conviction.

The evidence most favorable to the state reveals that on September 14, 1979, a Marathon service station in Portage, Indiana was robbed. After the police received a description of the robber and his automobile from a station attendant, they observed Manns

driving a car of similar description. When the police pursued him, Manns fled at an accelerated speed. The chase continued for a considerable distance until Manns overturned his automobile and was forced to run on foot. After pursuing Manns down an alley and over a fence, police captured him by forcing him to the ground and handcuffing him. Manns made several incriminating statements, both at the scene of his capture and as police returned him to the police station.

Manns appeals his conviction, arguing that:

(1) The trial court erred in admitting into evidence the incriminating statements he made after his arrest because he had not waived his *Miranda* rights, and because the statements were not otherwise made voluntarily.

(2) The police failed to comply with IC 35-1-4-1, thereby tainting his arrest and the subsequent incriminating statements.

(3) Much of the evidence presented at trial was irreconcilable, leaving it insufficient to sustain the verdict.

We affirm.

## I.

Manns asserts that several incriminating statements he made in the minutes following his arrest were not properly admitted into evidence at trial below. He bases his argument upon two distinct propositions:

(a) That he had not waived his *Miranda* rights when the statements were made, and

(b) That the statements were not made "voluntarily."

We note that the appellant's brief is wholly inadequate in presenting these issues for our consideration. He failed to outline what the "incriminating statements" were, under what circumstances they were made, or where they might be found in the record. He also failed to cite appropriate legal authority for the arguments presented. Nevertheless, we will undertake a review of the issues raised. *See Works v. State* (1977), 266 Ind. 250, 362 N.E.2d 144.

The record reveals that Manns made several incriminating statements within minutes of his arrest. When police informed him that he was under arrest, he said "I had to do it," or "I had to take it. I owed them money for dope." Shortly thereafter, the police advised Manns of his *Miranda* rights,[1] and escorted him to the police station. At trial, a police officer described the conversation that ensued during the trip:

"Q. Then there was the transport back to the police station? What, if anything, was said during that time?

A. There was considerable conversations. We talked from the beginning of the trip all the way to the arrival at the police station.

Q. This was after you had advised him of his rights?

A. Yes, Ma'am, it was.

Q. At that time did he say, 'I don't want to talk to you?'

A. He never said that.

Q. Did he say, 'I want to see a lawyer?'

A. He never said that.

Q. What did he say?

A. He gave me the story about Archie was at the corner of the gas station in another car and that I should be looking for Archie in this green Pontiac, and then said it was a green Ford and they were forcing him to commit this robbery and that he had to come up with $1,000 or so by sometime today or else they would get him, and he was forced to do this.

We had—I was talking back and forth to him, you know, why he ran and fled from the police, and I asked him where the gun was and said he never had a gun, and I said, 'Well, the girl seems to think you had a gun.' He said, 'I used a pair of pliers that was in my coat pocket.'

Q. Anything else that was said? Did he complain of the pain in his head?

A. Yes, he did. He said, you know, that his head did hurt him and, you know,

---

1. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

he wanted medical treatment. I said when we got to the police station, that I would get him medical treatment.

Q. During the time that he was in the car, did you notice any other signs of his physical condition such as vomiting or loss of consciousness?

A. No, there was none of that.

Q. What about his speech as he was talking to you?

A. He was excited. He spoke clearly. He answered questions, responded to them. I asked them general information about his background. He responded without hesitation. He was able to answer every question that I asked and he seemed eager to tell me the story about Archie, and Archie was of his making. We never came up with the name of Archie.

Q. Did he give a last name for Archie?

A. Not to me he didn't. I never heard a last name.

Q. Where did he say that Archie was during this robbery?

A. He said that he was parked in a car with another person or a couple other persons and they were in the corner of the lot someplace watching what was going on and that he told me they'd met earlier in the day and Archie had told them, you know, 'You are going to get up with some money,' and they was riding around and they had picked out this gas station and said, you know, 'This is the one we picked out,' and said, 'This is the one you got to do,' and he said he went in there, you know, and held up the girl. He mentioned to me that he did threaten to blow her away, but he said he never had a gun and no way he ever could have done it because he had these pliers in his pocket. Then I said, 'Why would you flee the police because we never seen Archie or anybody chasing you?' He said, 'Archie would find me and get me.' " [2]

As noted, Manns initially contends that the incriminating statements he made before arriving at the police station should not have been admitted as evidence at trial because he had not waived his *Miranda* rights at the time they were made.

■ Manns' challenge presents no problem as to his first statement that "I had to do it," or "I had to take it. I owed them money for dope." He made the statement spontaneously, as he was arrested, and at that point the police had not yet questioned him about anything. Because a *Miranda* warning is necessary only before a custodial interrogation, *no warning, and a fortiori no waiver*, was necessary before the volunteered statement was made. Therefore, the statement was admissible. *See Maxey v. State* (1969), 251 Ind. 645, 244 N.E.2d 650.

■ The incriminating statements made by Manns as he was escorted to the police station were also admissible. As our Supreme Court noted in *Brown v. State* (1979), Ind., 390 N.E.2d 1000, 1002:

"The question of whether or not there has been a valid waiver of *Miranda* rights is controlled by determining, from the totality of the circumstances, whether the defendant, after being advised of such rights, voluntarily chooses to forego them. *Richardson v. State* (1978), Ind., 373 N.E.2d 874, 875; *Nacoff v. State* (1971), 256 Ind. 97, 267 N.E.2d 165. We review this question on appeal as we do other sufficiency matters. We do not weigh the evidence, but rather determine whether there is substantial evidence of probative value to support the trial court's finding. *Murphy v. State* (1977), Ind., 369 N.E.2d 411."

■ In this case, there was testimony that Manns was fully informed of his *Miranda* rights before the incriminatory statements were made. Manns did not request the presence of counsel, nor did he refuse to answer questions put to him by the police.

2. These are the only incriminating statements entered into evidence at Manns' trial of which we are aware. When Manns arrived at police headquarters, he was again advised of his rights. At that time, Manns indicated he understood the rights, and *expressly* refused to waive them. *No statements made by the defendant after that time were admitted as evidence.*

Instead, he chose to freely discuss the robbery, and his role in it. We believe this evidence supports the trial court's determination that Manns voluntarily waived his *Miranda* rights. *See Miller v. State* (1974), 161 Ind.App. 563, 316 N.E.2d 589; and *Brown v. State, supra.*

In addition to Manns' argument that he had not waived his *Miranda* rights, he contends the incriminating statements were not otherwise made "knowingly and voluntarily," and were therefore not admissible as evidence.

Manns' attack is based on two theories. The first is that the police used unnecessary force in arresting him, in effect forcing the confessions from him. The second is that a head wound sustained at some point after he robbed the service station left him unable to make a "voluntary and knowing" statement. We disagree.

■ Again, the state had the burden of establishing that any incriminating statements were made voluntarily. In *Johnson v. State* (1968), 250 Ind. 283, 293, 235 N.E.2d 688, 694, our Supreme Court suggested the proper standard for determining voluntariness:

> " . . . [W]hether under all the attendant circumstances, the confession was free and voluntary, freely self-determined, the product of a rational intellect and a free will, and without compulsion or inducement of any sort, or whether the accused's will was overborne at the time he confessed."

■ However, in reviewing a trial court's determination that a statement was made voluntarily, we look only for substantial probative evidence to support the trial court's finding. We do not weigh the evidence. *Works v. State, supra.* In this case, the evidence reveals that the police did not use unnecessary force in subduing Manns. He had just led the police on a wild chase, first by car, and then on foot. Even after his apprehension, he continued to struggle. In light of this, we do not consider it unreasonable that police roughly forced Manns to the ground before handcuffing him. Fur-

ther, a police officer testified that at all times following his arrest, Manns was coherent and responsive. This is ample evidence from which the trial court could properly conclude Manns' incriminating statement was made voluntarily and knowingly, despite his head wound.

## II.

■ In his second asserted error, Manns apparently argues that Porter County police officers violated IC 35–1–4–1 by arresting him in Lake County and transporting him back to Porter County without first "appearing in court" in Lake County "with the accused." This violation assertedly tainted his subsequent incriminating statements, rendering them inadmissible. The argument is erroneous for several reasons.

Initially, the cited statute has no application to *warrantless arrests. See James v. State* (1972), 258 Ind. 392, 281 N.E.2d 469 at 472. Further, as our Supreme Court made clear in *James*, "This statute does not purport to be the exclusive means of procuring prisoners from one county to another in this state." We do not believe a police officer is barred from hotly pursuing a suspect into another county, arresting him, and returning him to the county where the crime was committed.

## III.

■ Finally, the appellant argues that in several respects, there were "irreconcilable conflicts" in the evidence presented by the state at trial, rendering the whole of the evidence insufficient to sustain defendant's conviction. For example, he argues that originally the service station reported $107 missing after the robbery, while later the defendant was accused of taking over $400. The defendant also argues a coat he threw from his car window during his flight from the police could not have been the one the robber wore during the robbery because the coat's pockets were too high, making it "impossible for appellant to have his hand in his jacket pocket [during the robbery], with or without a weapon." In addition, the defendant argues the hat recovered from

his automobile did not match the one worn by the robber. In answering the defendant's argument, we note only that it is not our function to reweigh the evidence presented at trial, or to decide factual questions of this nature. The defendant had an opportunity at trial to demonstrate he did not have the proper amount of money, that it was the wrong coat and the wrong hat. The trial court resolved those arguments against him. We will not reweigh the evidence to reach a different result.

The defendant's conviction is affirmed.

HOFFMAN, P. J., and STATON, J., concur.

